**Sedessa RUSTIN and Felicia Shade Tate, Appellants,**

v.

**DISTRICT OF COLUMBIA and Washington Patrol Services, Inc., Appellees.**

**Nos. 84–138, 84–261.**

District of Columbia Court of Appeals.

Argued Jan. 24, 1985.

Decided April 18, 1985.

---

John W. Perry, Bethesda, Md., with whom Rotraud M. Perry, Bethesda, Md., was on briefs, for appellants.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for the District of Columbia.

Ronald G. Guziak, Washington, D.C., for Washington Patrol Services, Inc.

Before PRYOR, Chief Judge, and NEBEKER and FERREN, Associate Judges.

PRYOR, Chief Judge:

This is an appeal from an order of the trial court granting the motions of appellees, the District of Columbia and the Washington Patrol Services, Inc. (hereinafter WPS), for summary judgment, and dismissing the claims of appellants, Sedessa Rustin and Felicia Shade Tate. We affirm.

*Factual Background*

On October 7, 1980, James Kenneth Tate was shot and killed by Barthaniel L. Robinson.[1] At the time of the shooting, both men were employed as security guards by WPS, a private firm, licensed by the District of Columbia,[2] engaged in the business of providing security services. The shooting occurred while Tate and Robinson were on duty at Waterside Mall in Southwest, Washington, D.C., in a building which was leased by the Government Services Administration (hereinafter GSA), a federal agency, and which was entirely occupied by the United States Environmental Protection Agency (hereinafter EPA). WPS was under contract with GSA to provide security services for the EPA building.

Robinson stated in his deposition that on the day of the shooting, he had been drinking alcohol and smoking marijuana prior to coming to work. Robinson was issued a gun when he arrived on duty at 2:30 p.m. He continued to consume alcohol and smoke marijuana while on duty. At approximately 5:30 p.m., Robinson left his duty station, walked to Tate's post in a different part of the building, and, apparently unprovoked, shot and killed Tate in front of several witnesses.

Robinson's deposition and his Army records reveal that prior to beginning his employment with WPS in April 1980, and while he was enlisted in the Army between January 1977 and December 1979, he had received treatment for drug and alcohol abuse. Robinson's records also indicate that he was disciplined while in the Army, released before his enlistment ended, and prohibited from reenlisting.

Following Mr. Tate's death, appellant, Ms. Sedessa Rustin, as administratrix of Mr. Tate's estate, filed a worker's compensation claim under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1982) (as incorporated by D.C.Code §§ 36–301 *et seq.* (1981)) (hereinafter LHWCA or the Act), for any and all benefits the estate was entitled to as a result of Mr. Tate's death. The estate subsequently received a compensation award.

Thereafter, Ms. Rustin and Felicia Shade Tate, the decedent's widow, brought suit under the D.C. Wrongful Death Act and the D.C. Survival Act[3] against the District of Columbia and WPS.

Appellants' action against the District of Columbia alleged that the District government's negligent failure to apply District of Columbia laws regulating the certification and employment of private security officers proximately caused the death of Mr.

---

**1.** Robinson later was convicted of manslaughter while armed.

**2.** The license was issued by the District of Columbia Department of Licenses, Investigations and Inspections following a background investi-

gation of WPS corporate officers and upon certification that the employees of WPS did not have criminal records.

**3.** D.C.Code §§ 16–2701, 12–101 (1981).

Tate. Appellants argue that had WPS security officers, and in particular Mr. Robinson, been subject to these regulations, Robinson, because of his personal history, could not have been hired as a security guard permitted to carry a gun. They reason that if Robinson had not been hired as an armed security guard, Tate would not have been killed.

In their action against WPS, appellants acknowledge that they secured an award under the LHWCA but contend that the "exclusive remedy" provision of the Act does not bar a tort action against the employer where the latter has committed an intentional tort. They allege that WPS intentionally conspired to bring about the shooting death of Mr. Tate.

The trial court, finding no disputed issues of material fact with respect to either defendant, granted both of appellees' motions for summary judgment and this appeal followed.

## I. DISTRICT OF COLUMBIA

### A. *The Regulations*

The focus of appellants' claims against the District of Columbia government is the District of Columbia Regulations for the Certification and Employment of Security Officers, 5JJ DCRR §§ 1.1 *et seq.* (1979) (hereinafter the Regulations).

The Regulations were adopted by the Council of the District of Columbia in 1974. They require that every private security agency seeking to operate in the District of Columbia must first be certified by the Mayor. *Id.* §§ 1.1, 2.1. The Regulations establish a number of qualifications for certification. For example, a person must be at least 18 years old, of good moral character and in reasonably good health. *Id.* §§ 3.3, 3.5, 3.6. In determining whether a person is of good moral character, the

Mayor is instructed to consider, "information received from the applicant's employers of the past five years, character references, convictions for misdemeanors, military record, and other relevant information...." *Id.* § 3.5. An applicant cannot be addicted to drugs or alcohol, and must pass a written test. *Id.* §§ 3.5, 3.7.

All security guards certified under the Regulations are required to carry identification cards issued by the Mayor. *Id.* § 4.1. Security guards must wear uniforms which are approved by the Mayor. The uniforms must be "distinctly different" from the uniform of Metropolitan Police Department officers. *Id.* § 4.2(a). The only weapon a security officer may carry in the course of employment is a "night stick constructed solely of wood"; the carrying of "a deadly weapon, handcuffs, or aerosol chemical dispenser in the course of employment" is prohibited and grounds for revocation of certification. *Id.* § 5.1(f).

Shortly after the adoption of these Regulations, officials of the GSA met with the District of Columbia Corporation Counsel to determine the impact of the Regulations on the GSA's ability to protect federal buildings in the District of Columbia.[4] GSA had contracted with a number of private security firms [5] to guard certain federal buildings. GSA was concerned about the possible applicability of the District regulations prohibiting the carrying of firearms because, according to the GSA Administrator, regulations of a number of federal agencies require the use of armed security officers in those agencies' buildings.

On January 25, 1975, the Acting Regional Administrator of GSA wrote D.C. Mayor Washington a letter formally requesting a legal opinion concerning the applicability of the new Regulations to contract security

---

4. The Administrator of GSA is responsible for protecting public federal buildings. 40 U.S.C. §§ 318, 318a, 490(a)(4), 490(b) (1982); 41 C.F.R. §§ 101–20.5 *et seq.* (1984). Moreover, the Administrator is given specific authority to establish a security force for the protection of federal

buildings and property. 40 U.S.C. §§ 318b, 318d, 490(a)(4), 490(b) (1982).

5. As distinguished from federal employees who guard federal buildings. Such employees are clearly not subject to the Regulations. *See* Regulations, *supra,* § 1.1(3)(B).

officers who guard federal buildings. Mayor Washington referred the matter to the Corporation Counsel with a request for an opinion.

On May 28, 1975, the Corporation Counsel issued a formal opinion in which he concluded that the Regulations were not intended to cover security matters of the federal government or security officers while they are on duty on federally-owned or leased premises in the District of Columbia pursuant to a contract with the GSA. As a result of the Corporation Counsel's opinion, the District government does not subject security officers under contract with GSA to the requirements of the Regulations nor does the District purport to certify such officers.[6]

### B. *Sovereign Immunity*

■ The trial court granted the District of Columbia's motion for summary judgment on the ground that the District's actions in question were discretionary in nature and, accordingly, the claim against it is barred by the principle of sovereign immunity.[7]

■ The doctrine of sovereign immunity is well-settled in the District of Columbia. *Chandler v. District of Columbia,* 404 A.2d 964, 966 (D.C.1979). Under this doctrine, the District government is immune from suit in tort where the act complained of was committed in the exercise of a discretionary function. However, if the act was committed in the exercise of a ministerial function, the government is not immune. *Wade v. District of Columbia,* 310 A.2d 857, 860 (D.C.1973) (en banc); *Wag-*

*shal v. District of Columbia,* 216 A.2d 172, 173 (D.C.1966).

■ Ministerial acts are those which require "the execution of a policy as distinct from its formulation." *Biscoe v. Arlington County,* 238 U.S.App.D.C. 206, 216, 738 F.2d 1352, 1362 (1984). In contrast, discretionary functions are described as those involving "policy considerations" where "no statutory or regulatory requirements [limit] the exercise of policy discretion." *Chandler v. District of Columbia, supra,* 404 A.2d at 966; *see Biscoe v. Arlington County, supra,* 238 U.S.App.D.C. at 216, 738 F.2d at 1362. An action is considered discretionary "if the prospect of liability for the decisions [an] officer must make in the course of his performance would unduly inhibit the officer's ability to perform his function." *Rieser v. District of Columbia,* 183 U.S.App.D.C. 375, 388, 563 F.2d 462, 475 (1975). They are decisions "for which there is no reason to believe a jury would render a sounder decision than those officials chosen, qualified, and prepared to make them." *Chandler v. District of Columbia, supra,* 404 A.2d at 966.

■ The activities at issue here—the Mayor's request for a legal opinion on the proper construction and application of District regulations, the issuance of the Corporation Counsel's opinion, and the District government's subsequent reliance on that opinion—all involve policy formulation and judgment-making processes. *See Biscoe v. Arlington County, supra,* 238 U.S.App. D.C. at 217, 738 F.2d at 1363 (quoting

---

6. Accordingly, neither Robinson nor Tate underwent a certification check by the District government. We observe that the GSA has its own regulations, which are similar to the District's, for certifying private security officers. Presumably, Robinson and Tate were required to meet the GSA qualifications.

7. In reviewing a trial court's order granting summary judgment, this court conducts an independent review of the record. *Phenix-Georgetown, Inc. v. Chas. H. Tompkins Co.,* 477 A.2d 215, 221 (D.C.1984); *Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983). Our standard of re-

view is the same as the trial court's standard for initially considering a motion for summary judgment. *Holland v. Hannan, supra,* 456 A.2d at 814. Pursuant to Super.Ct.Civ.R. 56(c) summary judgment is only appropriate when, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See Nader v. de Toledano,* 408 A.2d 31, 41 (D.C. 1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Willis v. Cheek,* 387 A.2d 716, 719 (D.C.1978).

*Thomas v. Johnson*, 295 F.Supp. 1025, 1031 (D.D.C.1968)); *see also* D.C.Code § 1–361 (1981) (Corporation Counsel shall furnish opinions to Mayor whenever requested to do so). Thus, it is clear that these actions are discretionary in nature and not ministerial. Accordingly, we conclude that the District government is immune from liability for damages that allegedly resulted from the government's actions with respect to the Regulations, and that the trial court's grant of summary judgment was therefore not erroneous.[8] *See Urow v. District of Columbia*, 114 U.S.App.D.C. 350, 351, 316 F.2d 351, 352, *cert. denied*, 375 U.S. 826 (1963) (immunity attaches where action complained of involved discretionary, quasi-legislative determination); *Cooper v. O'Connor*, 69 U.S. App.D.C. 100, 103, 99 F.2d 135, 138 (1938) (immunity attaches where challenge is to alleged erroneous construction and application of the law).[9]

## II. WPS

Appellant's remaining claim concerns the liability of WPS, the employer of Robinson and Tate, for damages in connection with Tate's death. The trial court granted WPS' motion for summary judgment on the ground that the exclusive liability provision of the LHWCA limits appellants to their recovery under the Act and precludes them from recovering damages in a tort action.

The LHWCA requires employers to provide compensation to employees who are disabled or killed in the course of their employment irrespective of fault. 33 U.S.C. §§ 901 *et seq.* (1976). The exclusive liability section of the Act states, in pertinent part:

> The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, ... and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death....

LHWCA § 905(a). Thus, the Act "deprives employees and their representatives of the right to pursue common law tort suits, such as wrongful death actions, against their employers or co-workers if the injuries are covered by the Act." *Harrington v. Moss*, 407 A.2d 658, 660–61 (D.C.1979).

■ Appellants emphasize that the restriction in § 905(a) does not reach actions where the employer specifically intended to injure the employee.[10] *Houston v. Bechtel Associates Professional Corp., supra*, 522 F.Supp. at 1096; 2A A. LARSON, *supra*, § 68.13, at 13–5, and cases cited at n. 11. "Employer," in the context of a corporation, is "a person who is realistically the alter ego of the corporation" and not "merely a foreman, supervisor or manager." 2A A. LARSON, *supra*, § 68.20, at 13–10. Appellants' theory in the trial court, and their contention on appeal is that while Robinson committed the actual shooting, it was the corporate officials of WPS who with actual, specific, and deliberate intent

---

**8.** Appellants urge us to examine the merits of the Corporation Counsel's 1975 opinion interpreting the scope of the Regulations. We decline to do so. Our approach is consistent with the reasons underlying the principles of sovereign immunity. The very purpose of the doctrine of sovereign immunity is to protect the government from having to spend significant amounts of time litigating the merits of its policy decisions. *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 819–20, 102 S.Ct. 2727, 2739–40, 73 L.Ed.2d 396 (1982); *McSurely v. McClellan*, 225 U.S.App. D.C. 67, 73–74, 697 F.2d 309, 315–16 (1982).

**9.** Appellants also contend that the District government is subject to liability in tort because

the government owed a "special duty of care" to appellants' decedent. Because we have resolved, as a threshold matter, that appellants' action against the District is barred by sovereign immunity, we need not address the issue of substantive liability. *See Rieser v. District of Columbia, supra*, 183 U.S.App.D.C. at 387–90, 563 F.2d at 475.

**10.** Appellants acknowledge, as they must, that § 905(a) bars an action alleging mere negligence or even willful, wanton, reckless and unlawful misconduct. *Houston v. Bechtel Assoc. Professional Corp.*, 522 F.Supp. 1094, 1096 (D.D. C.1981); 2A A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 68.13, at 13–5 (1976).

conspired to have Mr. Tate killed. According to appellants, the corporate hierarchy of WPS was involved in a narcotics ring operating out of the EPA building, and these officers conspired to kill Mr. Tate because Tate had discovered the existence of this operation.

We have examined the pleadings, the record, and in particular the trial court's detailed memorandum and we concur with the trial court's conclusion that these allegations are totally lacking in merit. We agree with the trial court that

upon the basis of the evidence proffered by plaintiffs in support of said allegation, no jury could reasonably conclude that WPS participated in any manner in the killing of Tate.

In sum, appellants have failed to present any proof, other than conclusory allegations and innuendo, which would support a finding that WPS specifically intended to kill appellants' decedent. They have not offered any deposition testimony, affidavits, or other documents which substantiate any of their claims. Thus, we conclude that there are no remaining material facts in dispute with regard to appellants' claims against WPS. In light of appellants' recovery under the LHWCA, they are now precluded from maintaining a suit in tort against WPS, and accordingly, summary judgment was properly entered.

Finding no disputed material issues with respect to appellants' claims against either appellee, and concluding that appellees are entitled to judgment as a matter of law, we affirm the trial court's orders granting summary judgment.

*Affirmed.*