Altagracia Kelly **GRILLO** and Antonio J. Grillo, Personal Representatives on behalf of the Estate of Zonya Grillo Durham and Durya Christina Durham, a minor by her co-guardians, Altagracia Kelly Grillo and Antonio J. Grillo, Appellants,

v.

**NATIONAL BANK OF WASHINGTON and United Mine Workers of America, Appellees.**

No. 86–882.

District of Columbia Court of Appeals.

Argued June 9, 1987.
Decided March 31, 1988.

Gary I. Rubin, Washington, D.C., argued the case for appellants. Joseph L. Nellis, Washington, D.C., was on the brief for appellants.

David P. Durbin, with whom Conrad A. Fontaine and James F. Jordan, Washington, D.C., were on the brief, for appellee National Bank of Washington.

Joseph P. Dyer for appellee United Mine Workers of America.

Before PRYOR,* Chief Judge, and MACK and ROGERS, Associate Judges.

ROGERS, Associate Judge:

■ The question presented by this appeal is whether appellants have stated a cause of action under the intentional tort exception to the exclusive remedy provision of the District of Columbia Workers' Compensation Act ("WCA"). D.C.Code § 36–304 (1981). The appeal arises out of the dismissal of a complaint under Super. Ct.Civ.R. 12(b)(6) for the failure to state a claim for which relief can be granted. We hold that only injuries specifically intended by the employer to be inflicted on the particular employee who is injured fall outside of the exclusivity provisions of the WCA and that the evidence presented to show the employer's knowledge with substantial certainty that an injury will result from an act does not equate with the specific intent to injure or kill when the injury is caused by the intentional act of a third person. Accordingly, we affirm.[1]

## I.

On September 23, 1982, a robber entered the branch of the National Bank of Washington ("NBW") located at 7th & Pennsylvania Avenue, N.W. ("Washington branch"), brandished a gun, and ordered the tellers to gather the money from the cash drawers. He then walked over to the decedent, Zonya Grillo Durham, who was the teller nearest the front door, leaned over the counter, and shot her in the head. There were no safety glass enclosures in front of any of the counters in the bank.

NBW had in effect throughout the relevant period a workers' compensation insurance policy with the Aetna Life and Casualty Company. In November of 1982, counsel for Durham's estate requested from Aetna "a complete and detailed breakdown of the funds available and to be made available to Durya [Christina] Durham," Durham's sole survivor. In addition, Antonio J. Grillo, who was subsequently named along with Altagracia Kelly Grillo as the personal representatives of Durham's estate, filed a notice of claim for death benefits with the Office of Workers' Compensa-

---

* Chief Judge Pryor was selected as a member of the Division to replace Senior Judge Nebeker who withdrew from active judicial service on December 11, 1987.

1. Grillo also contends that the United Mine Workers of America, the dominant shareholder of the National Bank of Washington, is subject to third-party liability because it actively participated in regulating the safety of the workplace. In view of the disposition of this case, we do not reach this issue.

tion ("OWC" or "agency"). Pursuant to these actions, Aetna immediately paid the George Washington Hospital for some of Durham's medical expenses and the OWC recommended that Aetna pay $1,000 for funeral expenses and death benefits of $128.87 per week, to be paid bi-weekly and subject to later adjustment.[2]

The personal representatives (hereinafter "Grillo") filed the instant wrongful death action on August 10, 1983, on behalf of Durham's estate and her sole survivor. They alleged that NBW knew with substantial certainty that a previous removal of protective glass would lead to Durham's murder. NBW filed a motion to dismiss the complaint for failure to state any claim upon which relief can be granted, arguing that Grillo's sole remedy is under the WCA. The trial judge granted Grillo the right to proceed with discovery in order to support her factual allegations, and subsequently directed Grillo to proffer "all of the evidence upon which [she] intended to rely to establish that defendant NBW knew with 'substantial certainty' that, by not replacing certain 'shields' in front of tellers' booths, death or injury would result to a teller" while expressly reserving the question of the appropriate legal standard. Grillo filed this evidence along with a supplemental memorandum and statement of genuine issues in opposition to NBW's motion.

Stated most favorably to Grillo, the facts revealed by the discovery are as follows. Prior to 1969, NBW had glass teller enclosures in most of its branches, but not the Washington branch in which Durham was murdered. Armed guards were also stationed at most of NBW's branches. Glass partitions were erected in the Washington branch shortly thereafter, pursuant to a security plan. In 1969, the Bank Protection Act of 1968, 12 U.S.C. §§ 1881 *et seq.* (1976) ("BPA"), which set minimum security standards and authorized security regulations, went into effect. Under one of the

regulations promulgated thereunder, 12 C.F.R. § 21.2 (1983), each bank was required to designate a "security officer" to implement a security program that would "equal or exceed the standards prescribed by this part."

In response, NBW acknowledged on May 23, 1969, that the BPA established standards "with respect to the installation, maintenance and operation of security devices and procedures, to discourage robberies, burglaries and larcenies, and to assist in the identification and apprehension of persons who commit such acts." A security program was adopted, including the appointment of a Security Officer and a Security Committee, and the delegation of general compliance responsibilities to branch managers. With respect to teller enclosures, the program stated that "the tellers' counters in fourteen of our offices have been heightened by the installation of glass partitions. This should provide a measure of protection *by preventing robbers from vaulting over the counter and looting cash drawers in quick, hit and run type robberies.* Glass partitions will be installed in our remaining offices as soon as possible." (Emphasis supplied). The Committee later issued a "Protective Committee Report," dated June 15, 1969, which stated that there were "high glass enclosures in 5 of our offices; 2 offices have the old-time high glass enclosures; 6 other offices are under contract for these enclosures and plans are being made for 4 more offices." The Report further stated that " 'Burns' guards, some of which are armed, are in all of our offices...." A follow-up report issued one month later stated that NBW had "installed high glass on the tellers' counters in 8 offices; 2 offices have the old-fashioned high glass left over from the days when all banks used it. In the next 3 weeks glass will be installed in 3 more offices. Plans have just been completed for 2 other offices and being made for 2 more." The Board of Directors

---

**2.** Aetna tendered a check, dated April 6, 1983, and made payable to the personal representatives, for the amount already accrued, $3,608.32. The attorney for the estate, however, returned the check to Aetna on the ground that Aetna had not responded to a counteroffer made to Aetna on behalf of the personal representatives, and because the check had apparently gone through the OWC.

approved this plan and did not later disavow the general desirability of safety glass. Glass partitions were not erected, however, in branches that have been opened or remodeled since that time.

The Washington branch underwent substantial remodeling between December, 1981, and March, 1982. As part of an overall architectural plan to make the inside of the building appear as it did in the nineteenth century, the protective glass was removed from the tellers' counters. A subsequent reaffirmation of the decision not to reinstall the safety glass was motivated at least in part by economic reasons,[3] and by the belief that they were not effective in preventing robberies.[4] According to the depositions of the governing officials of the Washington branch[5]—the Manager and the Executive Vice–President—they were unaware of the provisions of the 1969 security program and they knew that several new branches had been opened without security glass. Indeed, the Senior Vice–President and Director of Human Resources stated that he was generally familiar with the contents of the document, but that he had never seen it.

There is little evidence in the record of management discussion of safety considerations during the planning of the renovation, nor of any consultation with the designated Security Officer. That officer stated repeatedly in his deposition that he was never consulted about the removal of safety barriers nor given the opportunity to make recommendations. He admitted, however, that he was shown an architect's rendition of the branch, and that he queried, "We are not going to have the plate glass partitions back up?" In the Security Officer's opinion, glass partitions "tend to make it harder for a robber to jump over the teller counter," but he was not asked his opinion on this matter even though he attended a meeting with the managers and the architect. In their depositions, the Manager and Vice–President indicated their reliance on the omission of the glass from the architect's plan.

Officers of the bank were aware of teller complaints and of official concern over the lack of safety glass. Safety glass had been consistently advanced as a valuable security option for several years and it was repeatedly requested by tellers in other branches as early as 1973, when a teller in the Northeast branch was shot and killed during a robbery. The Director of Human Resources and other officials, for example, received in March of 1982 a copy of a December 9, 1980, petition for safety glass from the tellers of the Main Office branch.[6] Officials at the Washington branch were aware of the Main Office teller petition, and of several complaints by their own tellers, and studied the issue at that

---

3. Bullet-resistant safety glass cost approximately $6,000 per teller station. The record does not reveal the cost of the protective glass that had been used at the Washington branch. In response to employee requests that the safety glass be reinstalled, senior management responded that "it was too expensive and they did not feel it was necessary."

4. Two officers stated that on three occasions robbers had effectively gotten behind the counters even in those branches with safety glass. According to one, the barriers "don't prevent robberies and we have experienced in the past where they don't give protection to the tellers." The Security Officer testified that the protective glass that had been used at NBW neither deters robberies nor the injury of tellers, and that it was designed simply to deter robbers from jumping over the counters. The Security Officer also stated that he did not know whether Durham would have been killed if safety glass had been in place.

5. The Manager of the Washington Branch during the relevant period stated that "we are our own President of that branch and every function of a bank is handled through me." But as to security, "Our Security Officer would give us instructions and we would follow his instructions.... He has security of all the branches ... but I am sure he gets his instructions from senior management." The Security Officer testified, however, that he only had the authority to make recommendations.

6. The petition stated that, "Working in this part of town, it is mandatory to our safety, that the protective glass, which was removed during the remodeling of our branch, be placed back." The Security Officer testified that, with respect to the Washington Branch, he would not be surprised to learn that there had been 48 separate robberies since 1974.

branch.[7] In a meeting with several tellers, including Durham, the Manager told the tellers that the glass would not be reinstalled and that they could transfer to another branch if they so desired.

The Security Officer had also recommended in 1982 a series of measures, including the installation of bullet-proof glass, to compensate for a decision by the NBW President to disarm bank guards. The suggestion was considered by several officials, but the decision was held in abeyance pending further study. In a letter dated September 22, 1982, NBW was also informed of the favorable experiences of the National Bank of Detroit with bullet-proof glass. On the day of Durham's murder, an unarmed security guard was on duty at the Washington branch.[8]

Shortly after Durham's murder, the Washington branch employees again petitioned NBW for protective glass and, in subsequent meetings, were told that that matter would be studied. The Chairman of the Board also ordered a study of security measures in October of 1982, which resulted in the installation of some protective barriers. After some delay, a proposal was specifically presented to the Board of Directors, which adopted the recommendation and appropriated funds. Some time thereafter, tellers at the Washington branch observed workers with blueprints for the reinstallation of protective devices. But as

of the time this appeal was filed, the Washington branch remains without safety glass.[9]

The evidence in the record shows that the removed glass was not bullet-proof, but that employees had requested bullet-proof glass. The trial judge granted NBW's motion to dismiss on the ground that knowledge with substantial certainty that an injury will result from an act does not equate with the specific intent to injure or kill. For purposes of this appeal, however, we assume that, but for the removal of the glass, the robber would not have leaned over the counter and shot Durham. We further assume that the appropriate NBW officials were fully aware of the BPA's required adoption of a security program,[10] of all the proffered evidence with regard to the value of safety glass, and of the contents of the internal memoranda, security recommendations, and employee complaints.

## II. *Exclusivity of Remedy.*

The right to maintain a common law tort action is usually exclusive of the right to be compensated under the WCA. D.C.Code § 36–304(a) (1981) expressly states that liability under the WCA "shall be exclusive and in place of all liability of such employer to the employee." [11] Along with all other jurisdictions, *see generally* 1 A. LARSON, WORKMEN'S COMPENSATION LAW §§ 1–5 (1985) [hereinafter cited as LARSON], the

---

**7.** Safety glass was also frequently the topic of union negotiations and the employees had received some assurances that something would be done. Grillo also refers to union requests for protective barriers and a labor agreement in which NBW agreed "to provide safe, healthful and clean working conditions."

**8.** Durham was stationed at the teller's cage that was located nearest to the front door even though the Security Officer had directed that this location be used only on the busiest of days. There were only a few customers in the bank at the time of the robbery. The Manager disclaimed any knowledge of this security directive, and stated that Durham was assigned to work at this window regardless of the crowd. It appears from the record, however, that this directive was issued after Durham's death.

**9.** Subsequent remedial efforts are generally inadmissible "to prove negligence *or culpable con-*

*duct* in connection with the event." FED.R.EVID. 407 (emphasis supplied); *see also Boeing Airplane Co. v. Brown,* 291 F.2d 310 (9th Cir.1961). This evidentiary issue has not been addressed in the District of Columbia, but under the majority rule, subsequent events would be relevant and admissible in the instant case only to the extent they illuminated the knowledge of NBW officials before Durham's death. *See Crance v. Sohanic,* 344 Pa.Super. 526, 531, 496 A.2d 1230, 1233 n. 1 (1985).

**10.** The parties do not claim that the BPA and the regulations promulgated thereunder specifically require the installation of safety glass.

**11.** Section 36–304(b) similarly states that the WCA provides the exclusive remedy against the employer (or an agent acting within the scope of his or her employment), "for any illness, injury, or death arising out of and in the course of his [or her] employment."

Council of the District of Columbia ("Council") recognized that the WCA is justified "on a '*quid pro quo*' basis. That is the employer is made responsible for all occupational injuries, regardless of fault but the employee loses the right to sue for a tort liability award higher than the compensation benefits." COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS, REPORT ON BILL 3–106, LAW 3–77: THE DISTRICT OF COLUMBIA WORKERS' COMPENSATION ACT OF 1979, Part I, at 6 (January 16, 1980) (hereinafter "PUBLIC SERVICES REPORT"). Thus, for injuries which are compensable under the WCA, an employee is limited to the remedy provided by the statute. Conversely, for injuries which are not compensable under the WCA, no remedy is available under the statute, and the employee must seek redress by initiating a tort action in the courts.

The nature of a compensable injury under the WCA is defined in § 36–301(12) which provides that "injury" means an "*accidental* injury or death arising out of and in the course of employment...." [12] (Emphasis supplied.) Thus, by definition, injuries to an employee that are *intended* by the employer fall outside of the WCA's exclusivity provisions, even though they are work-related, because they are nonaccidental. *Rustin v. District of Columbia*, 491 A.2d 496, 501–02 (D.C.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985) (acknowledging the existence of an intentional tort exception to the exclusivity provisions of the WCA's predecessor, the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA")); *see Joyce v. A.C. & S., Inc.*, 785 F.2d 1200 (4th Cir. 1986) (only accidental injuries are compensable under the WCA); *Richardson v. The Fair, Inc.*, 124 S.W.2d 885, 886 (Tex.Civ. App.1939) ("an employer cannot correct and punish with whips the mistakes of his employees committed in the course of their employment, and protect himself against civil liability for the results of his assaults under the coverage of our Workmen's Compensation Act"). Consequently, intentional torts by the employer are expressly excluded from coverage under the WCA.

There is no reference in the legislative history to the intentional tort exception to WCA coverage. But the Council recognized that "compensation under this bill is in lieu of judicial action." COMMITTEE ON HOUSING AND ECONOMIC DEVELOPMENT, REPORT ON D.C. BILL 3–106, LAW 3–77: THE DISTRICT OF COLUMBIA WORKERS' COMPENSATION ACT OF 1979, Part II, at 14 (January 30, 1980) (hereinafter "ECONOMIC DEVELOPMNET REPORT"). The Council adopted the view that the purpose of the WCA was to provide a no-fault means of recovery for accidental injuries or death occurring in the course of employment. *See, e.g., id.* at 2. "A compromise was achieved by which the employee surrendered his right to sue for negligence, and the employer could no longer avail himself of the common-law defenses of contributory negligence, assumption of risk, and negligence of a fellow employee." *Id.*

The WCA's exclusion of employer intentional torts is to be contrasted with the situation in which a co-employee or third party intentionally injures an employee. Section 36–301(12) includes within the scope of compensable injuries "an injury caused by the willful act of third persons directed against an employee because of his [or her] employment." From the perspective of the employer, however, the injury is still "accidental" and the employer is liable so long as the injury arose out of and occurred in the course of employment. By contrast, the employer is bound by the character of his or her own acts in bringing about such a third-party injury and is unable in a civil suit for damages to plead that intended actions were accidental. *See* 2A LARSON, *supra*, § 68.12, at 13–7, –8.[13]

---

12. Section 36–301(12) also defines "injury" to include "such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury...."

13. We are aware of only one jurisdiction in which employees have been given an option either to sue their employers for intentional torts and/or to claim compensation. *See Magliulo v. Superior Court, City and County of San Francisco*, 47 Cal.App.3d 760, 121 Cal.Rptr. 621

### III. *Primary Jurisdiction.*

The agency charged with administering this statute, the District of Columbia Department of Employment Services ("DOES"), has primary jurisdiction to determine WCA coverage.[14] When the issue is whether the injury occurred in the course of employment, the governing standard is well-established in this jurisdiction. In *Harrington v. Moss*, 407 A.2d 658, 661 (D.C.1979) (interpreting the LHWCA[15]), this court ruled that "when there is a substantial question as to whether an employee's injuries are covered by an employment compensation statute, the employee must first pursue a remedy under the statute, thereby permitting the agency to make the initial decision concerning coverage." "A substantial question will exist 'unless [the] injuries were *clearly* not compensable under the [statute].'" *Tredway v. District of Columbia*, 403 A.2d 732, 735 (D.C.) (interpreting the similar Federal Employee's Compensation Act ("FECA")) (quoting *Daniels–Lumley v. United States*, 113 U.S.App.D.C. 162, 163, 306 F.2d 769, 770 (1962), *cert. denied*, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 92 (1979)).

These precedents are arguably inapposite to the WCA currently operative in the District of Columbia. But see note 15, *supra*. In *Tredway, supra*, 403 A.2d 732, the court relied on statutory language requiring that "all questions arising under" FECA shall be decided by the Secretary of Labor. By contrast, § 36–302 of the WCA provides only that the "Mayor shall administer the provisions of this chapter." *Tredway, supra*, 403 A.2d at 735. This court's subsequent decision in *Harrington, supra*, 407 A.2d 658, however, did not rely on similar language. The LHWCA provided only that the "Secretary shall administer the provisions of this chapter." 33 U.S.C. § 939(a) (1976). *Harrington* was also based on general principles of exclusive and primary jurisdiction. *See Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952); 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 22.1 (2d ed. 1984) (agencies have initial authority and courts have final authority). These precedents therefore govern the instant case.

■ For the purposes of primary jurisdiction, we conclude that intentional tort claims under the WCA should be governed by the same standards as the issue whether the injury occurred in the course of employment.[16] The concern of the rule set

---

(1975) (cumulative "or at least alternative" remedies). California does not, however, include the "by accident" language in its workers' compensation act, *id.* at 768, 121 Cal.Rptr. at 627; instead it provides compensation for an employer's intentional tort whenever the assault is "fairly traceable to an incident of the employment." *See Azevedo v. Industrial Accident Comm.*, 243 Cal.App.2d 370, 52 Cal.Rptr. 283 (1966). It also provides for increased compensation when the injury is the result of the serious and willful misconduct of the employer or supervisory personnel. *Id.* at 374, 52 Cal.Rptr. at 286 (CAL.LAB.CODE § 4553 (1955)). Even so, the *Magliulo* court restricted its holding to situations in which neither compensation nor tort damages had been awarded. 47 Cal.App.3d at 780, 121 Cal.Rptr. at 636.

**14.** D.C.Code § 36–302 (1981) provides that the "Mayor shall administer the provisions of this chapter, and shall make such rules and regulations, appoint and fix the compensation of such personnel, and make such expenditures as may be necessary." *See also id.* §§ 36–320, –322, –330. The Mayor in turn delegated his authority to the Director of DOES. Mayor's Order No. 82–126, 29 D.C.Reg. 2843 (1982). Under regula-

tions issued by the Director, claims are first filed with the OWC and, if their claims are contested, claimants are entitled to a hearing before an examiner and review by the Director. *See* 29 D.C.Reg. 5565 (1982). An appeal of a denial of a claim lies with this court only after this administrative process has been exhausted. *See generally Dell v. District of Columbia Dep't of Employment Serv.*, 499 A.2d 102 (D.C.1985).

**15.** The LHWCA served as a model for the WCA, *see* PUBLIC SERVICES REPORT, *supra*, Part I at 2, 9, 10, and is similar in all relevant aspects. *See* ECONOMIC DEVELOPMENT REPORT, *supra*, Part II at B & C. The D.C. Council replaced the LHWCA with the WCA because it believed that benefits under the LHWCA were overly generous and that high insurance rates created a competitive disadvantage in attracting business to the District. *Hughes v. District of Columbia Dep't of Employment Serv.*, 498 A.2d 567, 569 (D.C.1985). There is no evidence of any concern over administrative procedures or the scope of the exclusivity provisions.

**16.** This court has the "ultimate responsibility to provide authoritative statutory construction so as to ensure that the Board's determination to

forth in *Harrington, supra,* is the jurisdiction of the court, which depends on the coverage of the WCA. While "course of employment" may be the most frequent issue to arise, the allegation of an intentional tort involves similar questions of coverage and jurisdiction. Judicial and scholarly discussions of the primary jurisdiction requirement refer generally to questions of coverage and do not limit themselves to "course of employment" questions. *See, e.g., Harrington, supra; Tredway, supra;* 2A LARSON, *supra,* § 67.60; Note, *Employee Injury Cases: Should Courts or Boards Decide Whether Workers' Compensation Laws Apply?* 53 U.CHI.L.REV. 258, 266–67, 272–74 (1986). Indeed, the coverage of the WCA is defined in § 36–301(12), which excludes the employer's intentional tort and includes the "course of employment" requirement in the same sentence: " 'Injury' means accidental injury or death arising out of and in the course of employment." Moreover, except in cases where "the facts are so one-sided that the issue is no longer one of fact but one of law," requiring agency action preserves the *quid pro quo* bargain of the WCA by guaranteeing, in the first instance, expert agency adjudication of workplace injury claims, and thereby promotes uniformity in the application of the statute. 2A LARSON, *supra,* § 67.60.

The injury in the instant case uncontestably occurred in the course of employment. Employees who are physically attacked by third parties while in the performance of their employment duties are typically covered by workers' compensation statutes. *See, e.g., Tredway, supra,* 403 A.2d at 735. All that is required is that the obligations or conditions of employment create a "zone of special danger" that led to the injury. *Harrington, supra,* 407 A.2d at 662; *see generally* 1 LARSON, *supra,* § 11 (risk of assault increased by employment or had origin in employment). Accordingly, no purpose would be served in remanding the instant case to the agency for an initial determination of coverage.[17]

### IV. *The Governing Standard.*

In granting NBW's motion to dismiss,[18] the trial judge relied on the purported majority rule that only the specific intent to injure the employee falls outside of the WCA. The judge stated that the "substantial certainty" argument had appeal on its face, but he was unwilling to make what he perceived to be an expansion of existing law. The judge further acknowledged that, while intent in the traditional tort context is predominately defined in terms of the known probability that certain consequences will flow from one's actions, the use of this definition was less appropriate for workplace injuries because the WCA already provides a means of redress; in his view, the use of the broad "substantial certainty" test is more understandable when a tort action is the only remedy available to the injured party. The judge analogized "WCA intent" to tort claims that qualify for punitive damages and to the distinction between first and second degree

exclude an entire category of potential claimants (effectively a determination of unemployment compensation policy analogous to a legislative classification) comports with the legislative intent as expressed in the statute itself." *Cumming v. District Unemployment Compensation Bd.,* 382 A.2d 1010, 1013 (D.C.1978); *see also MCM Parking Co. v. District of Columbia Dep't of Employment Serv.,* 510 A.2d 1041, 1043–44 (D.C.1986).

17. It is unclear whether the OWC made a determination as to the accidental character of Durham's injury or whether this point was even argued. If such a determination was made, the agency has already exercised its primary jurisdiction, and this determination may have a *res judicata* effect on subsequent judicial proceedings. For purposes of this appeal we will assume that the OWC did not make a determination. See note 19, *infra.*

18. Of course, the presentation of materials beyond the pleadings, which are excluded by the court, means that a Super.Ct.Civ.R. 12(b)(6) motion shall be treated as one for summary judgment. *Bernay v. Sales,* 435 A.2d 398, 401 (D.C. 1981); *Doolin v. Environmental Power Ltd.,* 360 A.2d 493, 496 & n. 5 (D.C.1976). The trial judge in this case obviously believed that these materials had become irrelevant in light of his ultimate legal conclusion because Grillo had not alleged that NBW had the specific intent to kill Durham. *Cf. Vicki Bagley Realty, Inc. v. Laufer,* 482 A.2d 359 (D.C.1984). According to the trial judge's formulation of the governing standard, there would indeed have been no genuine issue as to any material fact.

murder: for punitive damages there must have been a specific purpose to injure and for a first-degree murder conviction there must have been a premeditated and positive design to kill.

Appellants' theory is that Durham's death was the result of the intentional acts of NBW since NBW knew with substantial certainty that Durham would be killed in the absence of installation of bullet-proof safety glass at the teller window. Under the oft-stated version of the majority rule, the intentional tort exception does not apply unless the employer had formed the "specific intent" to injure the employee. *See generally* 2A LARSON, *supra,* § 68.13, at 13–45 (adopting restrictive view of majority rule "deliberate infliction of harm comparable to left jab to the chin"). Appellants, therefore, urge us to adopt a definition of "specific intent" which embraces the substantial certainty standard recognized in tort. *See Johnson v. United States,* 178 U.S.App.D.C. 391, 395, 547 F.2d 688, 692 (1976) (act "substantially certain" to cause false imprisonment; citing RESTATEMENT (SECOND) OF TORTS § 35 comment h (1965)); *see also Beauchamp v. Dow Chemical Co.,* 427 Mich. 1, 24, 398 N.W.2d 882, 893 & n. 67 (1986). Although appellants have presented evidence which goes far beyond the allegations and innuendoes relied on by the widow in *Rustin, supra,* 491 A.2d 496, their arguments ultimately fail. Not only is the statute clear regarding coverage of injuries caused by the intentional act of a third party, but appellants' reliance on the substantial certainty standard adopted by some jurisdictions is misplaced.[19]

■ Section 36–301(12) of the WCA provides that a compensable injury includes "an injury caused by the willful act of third persons." In construing a statute, this court looks first to the language of the statute. *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C. 1983) (en banc). The language unquestionably provides coverage for the injury caused by a third party. "It is well established that the deliberate assault upon an innocent employee by some third person or co-employee is an 'accidental injury.'" *See* 2A LARSON, *supra,* § 68.12, at 13–9. Durham was killed by a bank robber. *Rustin, supra,* 491 A.2d 496, involved a statute that contained identical language to § 36–301(12), and the analysis in that decision is, therefore, persuasive if not binding on this division. *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971); see note 15, *supra.* The legal theory presented by appellants in the instant case is similar to that presented in *Rustin,* and under the analysis in *Rustin* it is likewise clear that appellants have failed to present evidence that NBW conspired with the robber or "participated in any manner in the killing." The removal of safety glass does not provide the basis for finding that NBW committed an intentional tort upon Durham. Consequently, it seems clear that appellants must seek to recover under the WCA and cannot avoid the immunity which is provided to NBW by the statute.

In *Rustin, supra,* 491 A.2d 496, a widow sued for the wrongful death of her husband who was employed as a security guard and killed by a fellow employee. Her theory was that although the actual shooting had been done by the co-employee, the corporate officials had intentionally conspired to have her husband killed since

**19.** In view of our disposition, we do not decide whether this civil action is precluded by the earlier claim for workers' compensation benefits from the OWC and the letter requesting an accounting of sums due from NBW's insurer (Aetna). *See Rustin, supra,* 491 A.2d at 501–02 (affirming the grant of summary judgment where the trial judge ruled that the plaintiffs were precluded from filing a tort action against the employer because they had already recovered from the employer under the LHWCA, but holding that the plaintiffs had proffered insufficient evidence that the employer had conspired with the security guard who had shot the employee). In any event, there would be critical questions of fact outstanding as to whether the estate effectively applied for and received WCA benefits, and also a substantial legal question as to whether to follow those jurisdictions that permit an employee to avoid his election prior to the final determination, *McGinnis v. Consolidation Casinos Corp.,* 98 Nev. 396, 650 P.2d 806 (1982), or the knowing and effective acceptance of benefits. *See, e.g., Romero v. J.W. Jones Construction Co.,* 98 N.M. 658, 651 P.2d 1302 (Ct. App.1982).

their negligent certification and employment of the co-employee, in violation of District of Columbia laws regulating security officers, had proximately caused the killing. *Id.* at 498–99. On appeal from the dismissal of the complaint, this court held that the widow had failed to introduce "any proof, other than conclusory allegations and innuendo which would support a finding that the employer specifically intended to kill [its employee, her husband]." *Id.* at 502. Hence she was limited to the recovery provided under the LHWCA. In agreeing with the trial judge that "no jury reasonably could conclude that [the employer] had *participated in any manner in the killing* of [the employee]," the court expressed the intentional tort exception in terms of the employer's specific intent to kill the employee. *Id.* (quoting trial judge; emphasis added); *see also Tredway, supra*, 403 A.2d at 732 (rape of school teacher working after hours is a compensable injury and only remedy against employer is under the FECA). This definition of the intentional tort exception is in accordance with the WCA's coverage of injuries caused by the intentional act of third persons and the legislative goals as well as the overwhelming weight of authority.

The facts of the instant case are somewhat similar to those in *Sullivan v. Atlantic Federal Sav. & Loan Ass'n*, 454 So.2d 52 (Fla.Dist.Ct.App.1984). A widower alleged that the bank failed "to provide any reasonable adequate security measures ... with conscious knowledge that such a decision would expose [the plaintiff's decedent, Mrs. Sullivan] to certain harm," and alternatively that the decision by the bank "not to provide any reasonable adequate security measures ... was made with willful, wanton and reckless indifference to the fact that [Mrs. Sullivan] would thereby be exposed to certain harm, including but not limited to actual injury or death caused by an armed robber." *Id.* at 54. Two armed robberies had occurred at the bank, and on the second occasion the robber threatened to return and kill Mrs. Sullivan. *Id.* at 53. Despite repeated requests by the employees for improved security, the bank refused and the robber subsequently returned and

in the course of a robbery shot Mrs. Sullivan. The court rejected the widower's breach of duty (or dual capacity) theory as well as his contention based on the bank's "conscious knowledge" that its refusal to improve security would expose Mrs. Sullivan to certain harm caused by the armed robber. Although recognizing that "the element of intent in civil assault does not necessarily involve a subjective desire to do harm," the court affirmed the grant of summary judgment for failure to state a cause of action of assault and battery since it was premised on an omission or failure to act. *Id.* at 54. The court stated:

"Mere negligence, or even recklessness which only creates a risk that the contact will result, may afford a distinct cause of action in itself, but under modern usage of the term it is not enough for battery." W. Prosser, Law of Torts, § 9, at 35–36 (4th ed. 1971). Because the complaint in this case purports to establish the intentional tort of assault and battery on the basis of an omission, it is insufficient as a matter of law to state a cause of action against [appellee bank].

*Id.* at 55. Accordingly, the court declined to reach the issue whether the suit was barred by the exclusivity provision of the state workers' compensation act. *Id.; see also Schutt v. Lado*, 138 Mich.App. 433, 437, 360 N.W.2d 214, 216 (1984) (allegations "distinguishable from those allegations of intentional tort which, in essence, claim only that an employer was *negligent* in permitting another person to commit an intentional tort").

In *Houston v. Bechtel Associates Professional Corp.*, 522 F.Supp. 1094 (D.D.C. 1981), relied on by the trial judge in the instant case, the District Court judge reached the exclusivity issue in construing identical exclusivity and "accidental injury or death" provisions of the LHWCA. The judge dismissed a complaint notwithstanding allegations that the employer had "willfully, wantonly, recklessly or negligently and in violation of applicable safety regulations exposed the plaintiff to unreasonably high levels of silica dust, as a result of which he contracted silicosis." *Id.* at 1095.

The case is factually distinguishable from the instant case, and presents an issue we do not decide, but the judge's interpretation of the statute provided accurate guidance to the trial judge here. In commenting that "[n]othing short of a specific intent to injure the employee falls outside the scope of [the exclusivity provision of the statute]," *id.*, the District Court judge declined to expand the exceptions to that provision because of the comprehensive nature of the legislative scheme and because "[k]nowledge and appreciation of risk is not the same as the 'intent' to cause injury." *Id.* at 1096 (citing W. PROSSER, LAW OF TORTS § 8 (4th ed. 1971)); *see also id.* for cases relied on. Quoting Professor Larson, the judge explained:

> The intentional removal of a safety device or toleration of a dangerous condition may or may not set the stage for an accidental injury later. But in any normal use of the words, it cannot be said, if such an injury does happen, that this was deliberate infliction of harm....

522 F.Supp. at 1096–97 (quoting 2A A. LARSON, WORKMEN'S COMPENSATION LAW § 68.13, at 13–9 (1976)).

In the instant case the trial judge did not address the intervening third-party provision of the WCA, § 36–301(12) and instead, in responding to appellants' contention, equated specific intent with the actual desire to injure, relying on his perceptions as to the comparable definitions of intent. *See Johnson, supra,* 178 U.S.App.D.C. at 395, 547 F.2d at 692. In some jurisdictions this analysis has been criticized as giving the employer an advantage that is unprecedented in other tort contexts, *see, e.g., Garratt v. Dailey,* 46 Wash.2d 197, 202–03, 279 P.2d 1091, 1094 (1955) (pulling chair from underneath one about to sit down), and that it does not comport with the plain language

of the statute. The argument is that the WCA only covers "accidental" injuries, and it is difficult to characterize as accidental an injury that the employer knew with certainty would follow from his or her actions, and such an act must also be considered to be premeditated. It is enough, the argument continues, that a person commits an act with the certain knowledge of its consequences, even if he or she does not desire them. The employee, accordingly, should receive equal compensation regardless of whether the employer intended the injury out of personal hatred or economic gain. For example, if the employer orders a certain task to be performed, for the good of the business, with the certain knowledge that the employee will be injured, the employer has intended to inflict that injury. The injury cannot be characterized as incidental or undesired: if the choice comes as a package, the employer must be charged with choosing all of its elements. *See, e.g., Beauchamp v. Dow Chem. Co., supra,* 427 Mich. at 23–24, 398 N.W.2d at 892–93 (discussing fact situation in which Spanish speaking employees who could not read warning labels were ordered to work near vats of cyanide without ventilation).

Appellants rely on cases adopting this argument. " 'If the actor knows that the consequences are certain, or substantially certain, to result from his act and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.' " *Boudeloche v. Grow Chem. Coatings Corp.,* 728 F.2d 759, 761 (5th Cir.1984) (quoting *Bazley v. Tortorich,* 397 So.2d 475, 482 (La.1981)).[20] These cases, however, do not involve an injury caused by the action of an intervening third party. Rather, in the jurisdictions that have adopted a substantial certainty standard, the injury at issue has occurred where the employer

---

**20.** *See also Neal v. Carey Canadian Mines Ltd.,* 548 F.Supp. 357, 378–81 (E.D.Pa.1982), *aff'd sub nom., Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481 (3d Cir.1985); *Foster v. Xerox Corp.,* 40 Cal.3d 306, 707 P.2d 858, 219 Cal.Rptr. 485 (1985); *Mingachos v. CBS, Inc.,* 196 Conn. 91, 100–04, 491 A.2d 368, 375–76 (1985) (express malice not required; "harm was the direct and natural consequence of the intended act"); *Handley v. UNARCO Industries,* 124 Ill.App.3d 56, 79 Ill.Dec. 457, 463 N.E.2d 1011 (1984); *Beauchamp v. Dow Chem. Co., supra,* 427 Mich. 1, 398 N.W.2d 882; *Millison v. E.I. duPont de Nemours & Co.,* 101 N.J. 161, 177–79, 501 A.2d 505, 514 (1985); *Reed Tool Co. v. Copelin,* 689 S.W.2d 404 (Tex.1985) ("intentional failure to furnish a safe workplace does not rise to the level of intentional injury except when the employer believes his conduct is substantially certain to cause the injury").

was aware of a dangerous condition in or around the workplace that was relatively certain to result in the death or injury of one or more of their employees.[21] Moreover, as Professor Larson points out, these jurisdictions have been unable to exclude ordinary negligence actions from intentional torts with any kind of consistent justification. 2A LARSON, *supra,* § 68.12 nn. 10.1 & 11 (Supp.).

This court does not have the option to reconsider the policy arguments in favor of enhanced recovery for injuries caused by reckless misconduct. The WCA represents a legislative acknowledgement that industry inevitably exposes workers to great risks of injury and a legislative judgment that those workers should be compensated according to the WCA schedule. Nor are we persuaded that the WCA evinces any different legislative intent as to coverage and exclusivity than the LHWCA. See note 15, *supra.* Accordingly, the majority rule of the restrictive definition of "intentional" adopted by this court in *Rustin, supra,* is properly applicable here. Professor Larson observes that, "if these decisions seem rather strict, one must remind oneself that what is being tested here is not the degree of gravity or depravity of the employer's conduct, but rather the narrow issue of intentional versus accidental quality of the precise event producing injury." 2A LARSON, *supra,* § 68.13. The rationale that a workers' compensation statute covers only accidental injuries fits only if the actor in fact intended the injury—not merely that the act resulted in the injury. *Id.* § 68.15, at 13–66. The conceded injustice resulting from the loss of full compensation is, as Professor Larson explains, partially mitigated by the benefits provided under the workers' compensation acts, and the harshness of the result in accordance

with the goals of workers' compensation regarding exclusivity—maintaining the *quid pro quo* between the employer and the employee and minimizing litigation, "even litigation of undoubted merit." *Id.* § 68.15, at 13–65. What appellants urge is not a clarification of the majority rule, but adoption of a new exception to the exclusivity provision of the WCA, in disregard of the coverage of injuries caused by a third-party, based on the evidence that NBW violated laws designed to assure the safety of the workplace and was aware that one of its employees had been killed by a robber under similar circumstances. Even those jurisdictions that have adopted the substantial certainty standard do not go so far when the injury is the result of an intentional act by a third person over whom the employer has no control. Thus the remedy must lie with the legislature.

Accordingly, the judgment is affirmed.

---

21. See, e.g., Boudeloche v. Grow Chemical Coatings Corp., supra, 728 F.2d 759 (employee injured by toxic paint); Neal v. Carey Canadian Mines, Ltd., supra note 20, 548 F.Supp. 357 (employee injured by exposure to asbestos); Foster v. Xerox Corp., supra note 20, 40 Cal.3d 306, 707 P.2d 858, 219 Cal.Rptr. 485 (employee injured by exposure to arsenic); Mingachos v. CBS, Inc., supra, 196 Conn. 91, 491 A.2d 368 (employee injured by explosion on employer's property); Handley v. UNARCO Industries, supra note 20, 124 Ill.App.3d 56, 79 Ill.Dec. 457, 463 N.E.2d 1011 (employee injured by exposure to asbestos); Bazley v. Tortorich, supra, 397 So.2d 475 (employee injured by garbage truck); Beauchamp v. Dow Chemical Co., supra, 427 Mich. 1, 398 N.W.2d 882 (employee injured by exposure to cyanide); Millison v. E.I. duPont de Nemours & Co., supra note 20, 101 N.J. 161, 501 A.2d 505 (employee injured by exposure to asbestos); Reed Tool Co. v. Copelin, supra note 20, 689 S.W.2d 404 (employee injured by unsafe lathe).