**Janet CLARK, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent.**

**BMA Capitol Hill, Intervenor.**

**CNA Insurance Companies, Intervenor.**

**No. 97–AA–1308.**

District of Columbia Court of Appeals.

Argued Sept. 14, 1999.

Decided Jan. 20, 2000.

---

Before REID and GLICKMAN, Associate Judges, and BELSON, Senior Judge.

GLICKMAN, Associate Judge:

Petitioner, Janet Clark, seeks review of a decision of the Department of Employment Services ("DOES") denying her claim for compensation benefits under the District of Columbia Workers' Compensation Act of 1979, D.C.Code §§ 36–301 *et seq.* (1997). Clark suffered the injuries that disabled her from work when an unknown assailant shot her for unknown reasons in the parking lot of her employer, Intervenor BMA Capitol Hill. A DOES hearing examiner concluded after an evidentiary hearing that Clark's injuries did not arise out of her employment, and ordered that her claim for relief be denied. The Director of DOES affirmed that order.

We reverse. Clark was entitled to the benefit of a statutory presumption that the injuries she suffered when she was assaulted at work did arise out of her employment and were compensable. We hold that her employer did not present sufficient evidence to rebut that presumption, and that the hearing examiner's contrary determination was, therefore, not supported by substantial evidence.

## I.

### SUMMARY OF THE EVIDENCE [1]

Janet Clark was employed by BMA Capitol Hill ("BMA") as a dialysis technician for thirteen years. She worked at BMA's clinic in Southeast Washington, D.C., assisting dialysis patients. On August 16, 1991, Clark drove to work as usual and parked her car, a red Chevrolet, in the employees' parking lot adjacent to the clinic. The parking lot was owned by BMA.

Jeffrey W. Ochsman, with whom Alan D. Sundburg, Washington, DC, was on the brief, for petitioner.

Mary G. Weidner, Baltimore, MD, with whom Stuart L. Plotnick, Silver Spring, MD, was on the brief, for intervenors.

Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

1. Our recitation of the facts tracks the hearing testimony, which was not materially disputed and which was accepted by the hearing examiner.

After parking her car, Clark went to work inside the clinic building.

Later that day, an unidentified man walked into the parking lot, looked around, and then asked Nathaniel Ford, another BMA employee who also happened to be in the lot, whether Ford knew "the lady that drives the red car." Ford pointed to a car which was burgundy in color, and asked the man if he meant that particular car. The man responded by saying no, that he wanted "the lady that drives this car," pointing to Clark's Chevrolet. Ford asked the man if he knew the name of the woman he was seeking, and the man said that he did not. Ford then took the man's name and phoned Clark, who was still inside the clinic building at the time. He informed her that a man in the parking lot wanted to speak with her. Clark told Ford that she did not recognize the name that the man had given. She looked out a clinic window and spotted the man, but did not recognize him then either. Nonetheless, Clark came downstairs and walked into the lot to speak with the stranger.

Clark approached him and asked him what he wanted. The man asked if the car he had pointed out was hers. Clark asked "why" and the man covered his mouth with his hands and said, "I'm tired of Terry and James." Clark responded to this cryptic statement that she did not know a Terry or James. The man then asked again if the car he identified was hers, and Clark said that it was. Without another word, the man thereupon took out a gun and shot Clark at point-blank range three times, in the head, the neck and the buttock.

Clark's assailant turned and fled immediately after the shooting and was never arrested. His identity is unknown, as Ford and Clark were unable to recall the name he gave them. No evidence was presented regarding the motive for the shooting. Clark testified that she did not know her assailant or why he attacked her. Clark had speculated in an early conversation with police officers that her daughter's husband might have wanted to hurt her.

Police investigation revealed no evidence that he was connected to the assault, however, and Clark testified that "several detectives assured [her] that he did not do it." BMA did not present any evidence tying Clark's son-in-law to the shooting.

## II.

### DECISIONS OF THE HEARING EXAMINER AND THE DIRECTOR

Having been seriously injured and disabled by her shooting, Clark sought temporary total disability benefits under the Workers' Compensation Act. BMA contested coverage. As the parties stipulated, the sole issue before the hearing examiner was whether Clark's shooting injuries arose out of and in the course of her employment. *See* D.C.Code § 36–301(12) (1997).

In addressing this issue, the hearing examiner accepted that Clark sustained her injuries on the premises of her employer while in the course of her employment. This, the examiner held, triggered the statutory presumption of a causal relationship between her injuries and her employment. *See* D.C.Code § 36–321(1) (1997). The burden then shifted to BMA, as the employer seeking to defeat coverage under the Act, to produce "specific comprehensive evidence" sufficient to rebut the presumption.

BMA did not dispute that Clark sustained her injuries "in the course of" her employment, but it did contend that its evidence rebutted the statutory presumption by demonstrating that Clark's injuries did not "arise out of" that employment. The hearing examiner evaluated this contention under the so-called "positional-risk" test enunciated by the Director in *Grayson v. Washington Metropolitan Area Transit Auth.*, H & AS No. 83–260 (May 23, 1985), *aff'd sub nom. Grayson v. District of Columbia Dep't of Employment Servs.*, 516 A.2d 909 (D.C.1986): "[f]or an

employee's injury to have arisen out of the employment, the obligations or conditions of an employee's employment must have exposed the employee to the risks or dangers connected with the injury."

The examiner found that Clark's assailant targeted her because she was the owner of a particular red automobile, and that he "voiced what can only be construed as the grounds of a personal vendetta" of unknown origin. Concluding that the assailant's statements prior to the attack "may reasonably be construed to denote a relationship predicated upon factors other than claimant's position as a dialysis technician with employer," the examiner held that BMA had presented sufficient evidence to rebut the presumption of a causal link between Clark's injury and her employment. The examiner did not discredit Clark's own testimony that she did not understand what her assailant said or why he attacked her. He concluded, however, that, deprived of the benefit of the statutory presumption of causation, Clark had failed to produce any evidence affirmatively linking the motive behind the assault to her employment. Furthermore, the examiner found that Clark did not establish any connection between the geographic location of her employment and the assault.[2] The hearing examiner accordingly held that BMA had successfully established that Clark's injuries did not arise out of her employment, and denied her claim for worker's compensation.

The Director affirmed this ruling on the ground that there was substantial evidence in the record for the hearing examiner to conclude that "this was not a random act of violence, and that it was targeted specifically to the owner of the red car, namely claimant."

### III.

### DISCUSSION

Clark's principal claim in this court is that the hearing examiner and Director

erred in finding that her assault did not arise out of her employment. She argues that this finding was invalid because it was speculative and not supported by substantial evidence. She further argues that, in the absence of substantial evidence establishing that her attack was not work-related, she was entitled to the statutory presumption of coverage.

### Standard of Review

This court "will affirm an agency finding of fact or conclusion of law so long as it is supported by substantial evidence notwithstanding that there may be contrary evidence in the record, as is often the case." *Davis–Dodson v. District of Columbia Dep't of Employment Servs.*, 697 A.2d 1214, 1218 (D.C.1997). "In summary, the DCAPA 'substantial evidence' test requires (1) the agency to make written findings of 'basic facts' on all material contested issues; (2) these findings, taken together, must rationally lead to conclusions of law ('ultimate facts') which, under the governing statute, are legally sufficient to support the agency's decision; and (3) each basic finding must be supported by evidence sufficient to convince reasonable minds of its adequacy." *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 42 (D.C.1979). "Substantial evidence means 'more than a mere scintilla' and such that reasonable minds might accept it as adequate to support a conclusion." *Dominique v. District of Columbia Dep't of Employment Servs.*, 574 A.2d 862, 866 n. 3 (D.C.1990) (quoting *Vestry of Grace Parish v. District of Columbia Alcoholic Beverage Control Bd.*, 366 A.2d 1110, 1112 (D.C.1976)).

In this case, the hearing examiner's findings of "basic facts," *i.e.*, the historical facts concerning who did what, when and

---

**2.** Although Clark testified that she was aware of previous crimes committed on her work premises, she did not present evidence specif-ic or substantial enough to support a claim of a dangerous work environment.

where, were unquestionably supported by substantial evidence. They are not challenged. What is in question is the inference that the examiner drew from those "basic facts," namely that Clark's assailant targeted her for reasons entirely unrelated to her employment. This inference was the linchpin of the examiner's conclusion that Clark's injuries were not covered because they did not "arise out of" her employment. To appreciate why this case turns on the validity of that inference, it is necessary to review how injuries arising from third party assaults in the workplace are treated under the Workers' Compensation Act.

### Compensable "Injury"

■■■ To be compensable under the Act, an injury must both arise out of, and occur in the course of, the employment. D.C.Code § 36–301(12); *Grayson*, 516 A.2d at 911. The definition of "injury" in D.C.Code § 36–301(12) includes intentional assaults on employees by third parties (*i.e.*, persons other than the employer).[3] *Grillo v. National Bank of Washington*, 540 A.2d 743, 748, 750–51 (D.C.1988). Although the assault is intentional, "[f]rom the perspective of the employer, ... the injury is still 'accidental' and the employer is liable so long as the injury arose out of and occurred in the course of employment." *Id.* at 748.

In this case, as in many cases of assaults in the workplace, two doctrines that are particular to workers' compensation law govern the coverage determination. These doctrines, as the hearing examiner recognized, are the positional-risk test for whether an injury "arises out of" employment, and the statutory presumption in favor of coverage.

**3.** "'Injury' means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results

### The Positional–Risk Test

■■■ In evaluating whether an injury "arises out of" employment, the District of Columbia has adopted the positional-risk standard articulated by the hearing examiner in this case. *See Grayson*, 516 A.2d at 911. As this court observed in *Grayson*, this is a "liberal" standard which obviates any requirement of employer fault or of a causal relationship between the nature of the employment and the risk of injury. *See id.* at 912 & n. 6; *accord, Harrington v. Moss*, 407 A.2d 658, 662 (D.C.1979). Nor need the employee be engaged at the time of the injury in activity of benefit to the employer. *See Harrington*, 407 A.2d at 662. Pursuant to the positional-risk test, an injury arises out of employment so long as it would not have happened *but for* the fact that conditions and obligations of the employment placed claimant in a position where he was injured. *See Grayson*, at 911 & n. 4. "This theory supports compensation, for example, in cases of stray bullets, roving lunatics, and other situations in which the only connection of the employment with the injury is that its obligations placed the employee in the particular place at the particular time when he or she was injured by some neutral force, meaning by 'neutral' neither personal to the claimant nor distinctly associated with the employment." A. Larson, 1 Larson's Workers' Compensation Law, § 3.05 (1999). On the other hand, "when it is clear that the employment contributed nothing to the episode, whether by engendering or exacerbating the quarrel or facilitating the assault, the assault should be held noncompensable even in states fully accepting the positional risk test, since that test applies only when the risk is 'neutral.'" *Id.* at § 8.02[1][c].

### The Presumption of Coverage

■■ D.C.Code § 36–321(1) establishes a presumption in favor of compensability for

from such accidental injury, and includes an injury caused by the willful act of third persons directed against an employee because of his employment." D.C.Code § 36–301(12).

employees injured on the job.[4] The presumption is "designed to effectuate the humanitarian purposes of the statute" and "reflects a 'strong legislative policy favoring awards in arguable cases.'" *Ferreira v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 651, 655 (D.C.1987) (quoting *Wheatley v. Adler*, 132 U.S.App. D.C. 177, 183, 407 F.2d 307, 313 (1968) (en banc)). To invoke the presumption, a claimant must present some evidence of (1) a death or disability and (2) a work-related event, activity or requirement which has the potential to result in or contribute to the death or disability. *See id.* "The presumption then operates to establish a causal connection between the disability and the work-related event, activity, or requirement." *Id.*

 Once the presumption is triggered, the burden shifts to the employer to produce "substantial evidence" that the disability did not arise out of and in the course of the employment. *See id.; Brown v. District of Columbia Dep't of Employment Servs.*, 700 A.2d 787, 791 (D.C.1997). "'Stated otherwise, the statutory presumption may be dispelled by circumstantial evidence specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event.'" *Ferreira*, 531 A.2d at 655 (quoting *Swinton v. J. Frank Kelly, Inc.*, 180 U.S.App.D.C. 216, 224, 554 F.2d 1075, 1083, *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976)). The substantial evidence test is intended to reflect the humanitarian purpose of workers' compensation. "We have made it clear that we 'will not sustain the administrative findings merely because they are substantiated by some isolated evidence. Our review must also take account of the settled rule that the Act is to be construed with a view to its beneficent purposes.'" *Wheatley*, 132 U.S.App.D.C. at 184, 407 F.2d at 314

(quoting *Friend v. Britton*, 95 U.S.App. D.C. 139, 141, 220 F.2d 820, 821 (1955)). Thus, we have said that "[w]hen it is established that an injury or death occurs in the 'course of employment,' that fact strengthens the presumption that it 'arises out of the employment, and *any doubts as to that* fact should be resolved in the claimant's favor." *Dunston v. District of Columbia Dep't of Employment Servs.*, 509 A.2d 109, 111 (D.C.1986) (emphasis in original); *Baker v. District of Columbia Dep't of Employment Servs.*, 611 A.2d 548, 550 (D.C.1992).

## Third-Party Assaults in the Workplace

 Applying the statutory presumption of coverage together with the positional-risk standard to workplace assaults, where an employee is assaulted by a third party on the employer's premises or otherwise in the course of employment, the employee's resulting injuries are presumed covered under the Workers' Compensation Act unless the employer presents substantial evidence that the assault was motivated by something entirely personal to the employee and unrelated to the employment. For this reason, even if the assault remains unexplained, it is compensable under the Act. *See* 1 LARSON, § 8.03[1], [3]. This policy comports with the humanitarian purpose of the Workers' Compensation Act; it results in compensation for those employees assaulted at work who simply do not know or cannot prove the motive behind the assault.

Case law in this jurisdiction reflects the foregoing analysis. In the paradigmatic case in this jurisdiction, *Hartford Accident & Indem. Co. v. Hoage*, 66 U.S.App.D.C. 160, 85 F.2d 417 (1936), the claimant was a chef who was in his employer's kitchen when an unknown assailant came into the kitchen, stuck a knife into the claimant's face, and then ran away. *Id.* The claimant had never seen his assailant before the

---

**4.** "In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of evidence to the contrary: (1) That the claim comes within the provisions of this chapter ...." D.C.Code § 36-321(1).

incident and never saw him again. The court held "that the claimant's injury arose out of his employment, because the terms and conditions of his employment placed the claimant in the position wherein he was assaulted by the assailant and sustained the injuries from which he suffered." 66 U.S.App.D.C. at 161, 85 F.2d at 418; *accord, Hartford Accident & Indem. Co. v. Cardillo,* 72 U.S.App.D.C. 52, 55, 112 F.2d 11, 14 (1940). Similarly, in *Kolson v. District of Columbia Dep't of Employment Servs.,* 699 A.2d 357, 361 (D.C.1997), the claimant was a bus driver who was walking to a hotel late at night after finishing his shift when he was struck from behind with a pipe by an unknown assailant. The motive for the assault was not discovered. This court held that so long as the claimant's walk to the hotel was related to or incidental to his employment, his injury from the unexplained assault on the way was compensable. *Id.* at 361–62. See also *Tredway v. District of Columbia,* 403 A.2d 732 (D.C.1979), where this court held that a teacher's injuries resulting from her assault, robbery and rape by two strangers in her classroom after class were covered by the Federal Employees' Compensation Act.[5] "[C]overage," we said, "cannot be denied on the grounds that the injury was not an inherent risk or hazard of the type of job. All that is required is that injury result from a risk incidental to the environment in which the employment places the claimant." *Id.* at 736.[6]

### The Assault on Clark

■ Turning to the present case, Clark established that she was at work, engaged in the course of her usual duties, when a co-worker summoned her to the employer-owned parking lot. There she was assaulted and seriously injured by an unknown assailant for unknown reasons. On these undisputed facts, the hearing examiner found, and we agree, that Clark presented enough evidence to invoke the § 36–321(1) presumption that her injuries arose out of her employment and were compensable.[7] We must consider, then, whether BMA presented substantial evidence "specific and comprehensive enough" to rebut the presumption, bearing in mind our obligation to resolve doubts in the claimant's favor. *See Brown,* 700 A.2d at 791; *Baker,* 611 A.2d at 550; *Dunston,* 509 A.2d at 111.

■ BMA's evidence, which the hearing examiner credited, showed that Clark was the victim of a targeted assault. Her assailant picked out a *specific* red car in the lot and asked for the *lady* who drove that car. He focused on that person to the exclusion of other BMA employees, including other employees present in the lot. The inference from these facts is obviously strong that Clark's assailant had prior knowledge of some sort concerning the driver of the red car and an animus toward that person, even if he did not know her name and could not recognize her on sight.

In our view, however, this evidence was not "specific and comprehensive" enough

---

**5.** The Federal Employees' Compensation Act uses the same causal test as the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), *see Tredway,* 403 A.2d at 736, which was the predecessor to the District of Columbia Workers' Compensation Act "and is similar [to it] in all relevant aspects," *see Grillo,* 540 A.2d at 749 n. 15.

**6.** In comparison, in *Fazio v. Cardillo,* 71 App. D.C. 264, 109 F.2d 835 (1940), coverage was denied because the claimant sustained his injuries in what the court found was a purely "personal altercation between the claimant and a co-employee, over a matter unrelated to

the performance of their duties." 71 App. D.C. at 265, 109 F.2d at 836.

**7.** The fact that Clark's injuries were sustained in the employer's parking lot during her break, rather than in the building while she was actually performing her duties, does not preclude compensation—nor do the parties dispute the notion that injuries received in an employer parking lot may be compensable. *See Blaw–Knox Foundry & Mill Machinery, Inc. v. Dacus,* 505 N.E.2d 101 (Ind.App.1987); *Motion Control Indus. v. Workmen's Compensation Appeal Bd.,* 145 Pa.Cmwlth. 399, 603 A.2d 675 (1992).

to remove doubts and rebut the presumption of coverage, for the precise reason that the motive behind the assault remains unknown and speculative. A finding that Clark's assailant had *some* motive to target her specifically is not the same as a finding that he had a *personal*, non-work related motive to do so. It is possible to speculate about a multiplicity of motives for the assault, some having a relationship to Clark's employment and some not.

■ We do not suggest that an employer must rule out every conceivable work-related hypothesis in order to shoulder the burden of producing substantial evidence to rebut the presumption that an *unexplained* workplace assault arises out of the claimant's employment. But the evidence before the hearing examiner in this case did not afford a reasonable basis to choose the "personal vendetta" hypothesis over other possible hypotheses that would link the attack on Clark to the obligations or conditions of her employment. For example, had the assailant said something to Clark that was clearly personal, rather than the incomprehensible mutterings he did make, this might be a different case because then the hearing examiner would have had a basis for finding a purely personal motive for the assault. On the record before us, however, there was simply no evidence which would have enabled the examiner to make a rational choice among the competing possible explanations for the assault.[8] It is for this reason that

we can find no substantial evidence to support the hearing examiner's inference. In fact, some of the evidence in this case casts doubt on the "personal vendetta" explanation. The assailant did not know Clark by face or name. He did not recognize her as being the driver of the car he pointed out. Clark did not know or recognize him or his name. And the assailant's unintelligible remark that he was "tired of Terry and James" lends no support to the "personal vendetta" theory. We cite these facts not because we think that they refute the "personal vendetta" explanation, but only to underscore the point that that explanation was not shown to be more likely than alternative explanations that incorporated a causal relationship to Clark's employment.

In short, the finding that the assault on Clark was the product of a personal vendetta unrelated to her employment was not supported by substantial evidence. Hence that finding cannot stand. *See Citizens Association of Georgetown,* 402 A.2d at 42. This case is not, in our view, materially distinguishable from *Hoage.* As in *Hoage,* so too here "the claimant's injury arose out of [her] employment, because the terms and conditions of [her] employment placed the claimant in the position wherein [she] was assaulted by the assailant and sustained the injuries from which [she] suffered." 66 U.S.App. D.C. at 161, 85 F.2d at 418. BMA did not, therefore, succeed in presenting sufficient evidence to

---

**8.** The unsubstantiated speculation, offered by Clark herself to the police following her shooting, that her daughter's husband might have had a motive to hurt her, had no probative value. As noted above, there was no evidence that the son-in-law was connected to the shooting. *Cf. Harris v. Henry's Auto Parts, Inc.,* 57 N.C.App. 90, 290 S.E.2d 716 (1982) (affirming an award of benefits to decedent's family where even though a previous girlfriend had shot Harris in the past, the police had no proof that she was involved).

Significantly, too, the hearing examiner and the Director gave no weight to the suggestion that the son-in-law might have been involved. Even if there had been substantial evidence supporting the hypothesis that Clark's son-in-

law was responsible for the attack on her, " 'this court cannot uphold a DOES decision on grounds other than those actually relied on by the agency.' " *District of Columbia v. District of Columbia Dep't of Employment Servs.,* 734 A.2d 1112, 1115 n. 3 (D.C.1999) (quoting *Jadallah v. District of Columbia Dep't of Employment Servs.,* 476 A.2d 671, 675 n. 3 (D.C. 1984)). "[A]n administrative order can be sustained only upon the basis relied upon by the agency"; where facts "do not form a part of the agency's decision .... [w]e cannot substitute our judgment for that of the agency nor make findings on issues which the agency did not address." *Cooper v. District of Columbia Dep't of Employment Servs.,* 588 A.2d 1172, 1176 (D.C.1991).

rebut the statutory presumption of coverage.

Accordingly, we reverse the decision of the Department of Employment Services denying Clark's claim for relief on the ground that her injuries did not arise out of her employment, and we remand this case for a determination of the benefits to which Clark is entitled under the Act.

*So ordered.*

BELSON, Senior Judge, dissenting.

I submit that consideration of the hearing examiner's findings of fact and due deference to the Department of Employment Services' interpretation of the statute it administers require affirmance.

The majority, concluding that this case is not materially distinguishable from *Hartford Accident & Indemnity Co. v. Hoage*, 66 U.S.App.D.C. 160, 85 F.2d 417 (1936), holds that the hearing examiner's finding that the assault on claimant was unrelated to her employment was not supported by substantial evidence. I suggest that the majority errs when it rejects the Director's conclusion "that there [was] substantial evidence in the record for the Hearing Examiner to conclude that this was not a random act of violence, and that it was targeted specifically to the owner of the red car, namely claimant" and that "there was substantial evidence in the record for the Hearing Examiner to find that claimant's injury did not arise out of her employment." The salient facts merit highlighting.

The young man who later shot claimant walked into the parking lot of the intervenors' medical facility at about 6:00 p.m. on August 16, 1991, about six hours after claimant arrived at work. He walked up to Nathaniel Ford, claimant's fellow employee, and asked specifically for the "lady that drives the red car." Thinking this unusual, Ford pointed out a burgundy colored car, and the young man said, "no, not that car, the lady that drives this car," indicating claimant's car. Ford telephoned claimant after getting the individual's name (which both he and claimant later forgot), but claimant said she did not recognize the name. Claimant testified that she did not recognize the individual either upon looking down from a window above or when she spoke with him after she came down to the lot.

According to claimant, the young man then asked her if the red car was her car and she asked "why[?]." She testified that then "he put his hands over his mouth and he said I'm tired of Terry and James." In response, she said she did not know Terry or James. According to claimant, he then said, "is that your car with the luggage rack on it and I said yes and at that point he shot me." Claimant said she did not recognize the names Terry and James "in any capacity." They were not co-workers or patients.

After the shooting incident, claimant told police that she thought her son-in-law might have been responsible for it. He had been beating claimant's daughter severely, and claimant wanted her daughter to leave him. Claimant surmised that her son-in-law was in the drug trade. Claimant thought he might present a danger to her and she admittedly carried a gun for one day during the month preceding the incident because "she had gotten very upset and just tired of the situation that was going on with him."

Claimant later testified that it was not her son-in-law who shot her, and that she had been told by detectives investigating the shooting that he did not do it. Claimant's daughter was murdered by gunshot less than two months after the attack on claimant.

Claimant introduced into evidence a letter and report written by Dr. Katherine D. Owens, a licensed psychologist of the Family and Child Center, which included the remark that "this patient was the victim of a professional shooting. One month after she was shot, her daughter was killed in a professional shooting." Dr. Owens was

not called to testify concerning the basis of her remarks. Intervenors' counsel did not ask the hearing examiner to give the remarks by Dr. Owen any weight—or even call attention to them—in arguing that the injury did not arise out of claimant's employment. Thus, we can give them no weight.

The hearing examiner made no findings concerning any role claimant's son-in-law might have played, but based his findings on the evidence of what transpired at the time of the shooting and circumstances surrounding claimant's employment. Based on that evidence, he found:

> The sole evidence of record is clear that the assailant herein had targeted the female owner of claimant's automobile [red with a luggage rack]; he searched a parking lot for claimant's car as a means of identification; upon ascertaining the identity of the owner, and confronting her, the assailant voiced what can only be construed as the grounds of a personal vendetta, and then proceeded to assault the person toward whom said vendetta was aimed.

The examiner went on to find that there was not "a single iota of evidence, substantial or otherwise, which links the motive behind her assault to her employment."

On review, the Director of DOES observed that "substantial evidence is such relevant evidence as a reasonable mind might find as adequate to support a conclusion," citing *George Hyman Construction Co. v. DOES,* 498 A.2d 563, 566 (D.C. 1985). The Director held that there was substantial evidence in the record supporting the hearing examiner's conclusion that this was not a random act of violence, but an act targeted specifically to the owner of the red car, namely claimant. Accordingly, the Director concluded "that claimant's injury did not arise out of her employment."

Like the Director, I regard the examiner's findings as entirely reasonable. Under the circumstances there was substantial evidence—not just speculation—supporting the conclusion that claimant's injury did not arise out of her employment.

The hearing examiner applied the positional risk standard which had been applied by the Director and approved by this court in *Grayson v. D.C. Dep't of Employment Servs.,* 516 A.2d 909, 911 (D.C.1986). There the Director noted as follows:

> For an employee's injury to have arisen out of the employment the obligations or conditions of employment must have exposed the employee to the risks or dangers connected with the injury.

As the hearing examiner and the Director correctly concluded, the employer in this case adduced substantial evidence that claimant's employment did not expose her to the injury that befell her. It is noteworthy that in reaching this conclusion both gave full effect to the presumption of compensability for employees injured on the job. The majority notes that when an injury occurs "in the course of" employment, that fact strengthens the presumption that it "arises out of" the employment, and that "any doubts" as to that fact should be resolved in the claimant's favor. That does not mean, however, that when a claimant advances a colorable but ultimately unpersuasive argument about what inferences can be drawn from the evidence, the claimant prevails by dint of having made the argument. While the majority fails to articulate any work-related motive for the assault which would make it plausible to conclude that the act arose out of claimant's employment, the Director has articulated a reasonable basis for determining that the shooting was not work-related.

The assailant came onto the premises looking for a particular person, the lady who drove the red car with a luggage rack. He was not recognized as an employee or patient. His statement that he "was tired of Terry and James" can reasonably be taken to indicate that his motivation had something to do with persons bearing

those names—but no persons with the names Terry or James were patients or employees at the medical facility. Indeed, no patient had ever threatened claimant, and the assailant was not a co-worker. In shooting his carefully selected victim, assailant was not performing a random act of violence, like the person who burst into a restaurant kitchen and assaulted a chef as he was going about his work, as in *Hoage, supra*, or like those who burst into a classroom and assaulted a teacher who happened to be there grading papers, as in *Tredway v. District of Columbia*, 403 A.2d 732 (D.C.1979).

The circumstances of the incident provided, as the hearing examiner found, evidence "specific and comprehensive enough to sever the now presumed correlation between the employment event or activity and the injury." I agree, adding the observation that what is "specific and comprehensive enough" must depend upon the nature of the case. Here, a review of all the facts of record shows no indicia of a relationship between the injury and claimant's work; rather the actions and statements of the assailant point to a private or personal reason for the act.

The majority opinion disagrees, "for the precise reason that the motive behind the assault remains unknown and speculative. A finding that Clark's assailant has *some* motive to target her is not the same as a finding that he had a *personal*, non-work related motive to do so." But the hearing examiner found that assailant's words and actions "may reasonably be construed to denote a relationship predicated upon factors other than claimant's position as a dialysis technician with employer," *i.e.*, there was a finding not merely that there was "some motive" but a finding that the motive was not work-related. There was also the reasonable finding that the matter was "personal."

In reaching its result, the majority dismisses the shooter's statement "I'm tired of Terry and James" as "incomprehensible mutterings." To the contrary, the state-ment has real significance to the outcome. The fact that the shooter put his hand to his mouth does not make his words "mutterings." More important, his words were clearly heard by claimant, even though she said she did not know their significance, and they suggested that a matter relating to "Terry and James" motivated the attack. Most important, "Terry and James" were not co-workers of claimant or patients at claimant's place of employment. If the assailant made a mistake about his chosen victim, there is absolutely no indication that the mistake had any relationship to her work environment. Thus the statement tends to establish that the shooting was not work-related. It also helps to refute the majority's central thesis that because the "precise reason behind the assault remains unknown and speculative" the employer has not adduced sufficient evidence to rebut the presumption that the shooting arose from the work. To the contrary, I submit, what is sufficiently known—and reasonably inferred by the department and all of the circumstances— is that the shooting did not arise from the employment.

The majority's final conclusion—that the case is not materially distinguishable from *Hoage, supra*, does not survive analysis. *Hoage*, again, was the case in which the D.C. Circuit found that a chef's injury arose out of his employment where he had been attacked by an unknown assailant. The chef had been working in the kitchen, where his work required him to be, when an unknown person entered the kitchen, struck another man, stabbed the chef in the nose, and then ran up some stairs and jumped out a window. This case is markedly different from *Hoage*. For *Hoage* to have been comparable, the assailant there would have to have entered the kitchen and asked for the whereabouts of a person identified by a non-work related factor such as the car he drove, and then, upon learning that the chef was that person, made a reference to a motive related to persons not connected with the work, and

then stabbed him. To make it more analogous to this case, claimant would have to have left his work station and met the assailant elsewhere on the premises in response to the identification the assailant conveyed. The differences are determinative of the result.

. The other two authorities which the majority uses to delineate the area of jurisdiction concerning third-party assaults are readily distinguishable from this case. Similar to *Hoage*, in *Kolson v. District of Columbia Dep't of Employment Servs.*, 699 A.2d 357 (D.C.1997), this court found that the employee's injuries arose out of his employment where he had been attacked by an unknown assailant. Claimant, a bus driver, was attacked while walking to a hotel in the middle of the night, following completion of his twelve hour driving shift. The employee's injury in *Kolson* "grew out of his employment because it resulted from a risk created by his employment—his arrival at odd hours in places away from his home and the necessity of using the public streets to seek lodging." *Id.* at 361. Our present case is clearly distinguishable—claimant's employment did not cause her to be exposed to any such risk and claimant was not traveling to or from work at the time of the attack. The *Kolson* court, in deciding that claimant's injuries were compensable, emphasized the "circumstances of Mr. Kolson's interstate employment," including "the time of his arrival in the District" and "his walk to the hotel" after completing his shift at 4 a.m. Comparable circumstances were not present in the case at hand.

Further, in *Tredway, supra*, this court held that claimant's injuries arose out of employment and were compensable. In contrast to the present case, *Tredway* involved a teacher who was assaulted by two male strangers while she was alone in her classroom grading papers. This court determined that "the risk of attack was incidental to the environment in which appellant's job placed her," as the claimant teacher alleged that the school had been the scene of three previous similar attacks on female teachers. *Id.* at 736. The teacher's job required her to perform her work in the classroom and to be present in the "zone of danger" during work hours. *Id.* at 736. The present case is substantially different from *Tredway* principally, but not solely, because claimant here was not found to have been placed in increased danger or risk because of her employment.

The nub of it is that where an assailant comes onto the work premises and personally seeks out and injures a particular employee whom the assailant has identified in advance by name or other means, and where there is no basis for inferring that the motive for the attack is related to the claimant's employment, but there is a reasonable basis for inferring that it was private or personal, it cannot be said that the injury arose out of the work. *See* A. LARSON, 1 LARSON'S WORKERS' COMPENSATION LAW, § 8.03[1] (1999) (assaults which are inherently private in origin are not deemed to arise out of the work). In my view, the assault here is properly deemed an assault inherently private or personal in nature within the categories of assault framed by Larson. The case for this result is strengthened when, in addition to the assailant's pre-selection of the victim, there is some affirmative evidence that the motive that can be inferred is not work-related, as here where assailant's only reference to motive related to two persons who had no connection with the work.

In reviewing this case, this court should consider that the Department of Employment Services is fully cognizant of the case law which deals with the determination of when an injury arises out of a claimant's employment. This is a much discussed issue. The rulings of both the hearing examiner and the Director refer to some of the leading cases. The agency has concluded that claimant should not be compensated where it has reasonably been found that the assault causing her injury was directed at claimant personally and without regard to her employment, even

though it is not clear precisely what non-work-related motive prompted the personal attack. The result we review represents the Department's considered view that the incident in question falls outside this jurisdiction's expansive interpretation of work-relatedness. I submit that the court, giving due deference to the view of the Department, should reach the same conclusion. *See Gomillion v. District of Columbia Department of Employment Services,* 447 A.2d 449 (D.C.1982).

I dissent.