*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-AA-0560

UNITED PARCEL SERVICE, *et al.*, PETITIONERS,

V.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

WALTER BROGDON, INTERVENOR.

On Petition for Review of an Order of the
Compensation Review Board
(2020-AHD-000569)

(Argued October 27, 2022                    Decided July 20, 2023)

*Todd E. Saucedo* for petitioners.

*Karl A. Racine*, Attorney General for the District of Columbia at the time of argument, *Caroline S. Van Zile*, Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, filed a statement in lieu of brief for respondent.

*Matthew R. Harkins*, with whom *William J. Inman* was on the brief, for intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, DEAHL, *Associate Judge*, and FISHER, *Senior Judge*.

DEAHL, *Associate Judge*:  Walter Brogdon, a package delivery driver for United Parcel Service, parked his delivery truck intent on taking his lunch break.  He had planned to meet a friend at a bagel shop about half a mile away from where he parked, and he rented an electric moped-style scooter to make his way there.  He crashed and injured his leg en route.  A divided panel of the Compensation Review Board found that his injury arose out of and in the course of his employment and awarded him disability benefits.  Because we conclude that our precedents compel a different result, we reverse.

## I.

On the day of the incident, Brogdon and his friend planned on spending their lunch break at Bullfrog Bagels near Eastern Market in the Capitol Hill neighborhood.  UPS gave its delivery drivers a ten-minute paid break and an hour-long unpaid lunch break, requiring that they stay within a one-mile radius of their delivery route.  Brogdon stacked his breaks together—the ten minutes immediately followed by his lunch break—so that he was using his paid time when he was injured, shortly after leaving his truck.[1]  Due to road closures, Brogdon could not

---

[1] UPS does not dispute on appeal that Brogdon was using his paid break at the time of the accident.

park near the bagel shop, so he decided to rent a scooter and ride there.  Brogdon estimated it was about half a mile away.

Brogdon had never ridden an electric scooter before, and he used one that was parked on the street and available for short-term rentals via a phone app.  He traveled a few blocks without incident, but as he approached an intersection, he saw that the driver in a car beside him "was trying to make the light real fast."  That "kind of scared" Brogdon, who "slammed on the brakes and then just wrecked the scooter."  Brogdon broke his left leg—a tibial plateau fracture—which required time away from work, two surgeries for treatment, and steroid injections for pain relief.

Brogdon filed a workers' compensation claim seeking medical expenses and disability benefits for his five-month recovery period.  UPS and its insurer, Liberty Mutual, contested his claim, arguing that Brogdon's injury was not compensable because it did not arise out of his employment as it was not "reasonably incidental" to his work.  An Administrative Law Judge agreed and denied the claim after a hearing.  The ALJ concluded that "the renting and riding of a scooter to lunch was not a foreseeable activity" so that Brogdon's injuries did not arise from an employment-related risk, but a personal risk (concepts discussed further below).

Brogdon appealed to the Compensation Review Board (CRB). The CRB reversed the ALJ's order, reasoning that Brogdon's scooter ride to lunch fell within the "personal comfort doctrine," providing (as the CRB described it) that employees who "engage in acts which minister to personal comfort do not thereby leave the course of employment." The CRB noted that scooters have become pervasive in the District, so that their use was not so unforeseeable as to bring it outside the course of Brogdon's employment.

In its order, the CRB distinguished *Grayson v. D.C. Department of Employment Services*, 516 A.2d 909 (D.C. 1986), a case that similarly involved a lunch-break vehicular accident. In that case, a WMATA bus driver was attempting to take her personal vehicle out on her paid lunch break when, as she pulled out of her parking space, another vehicle crashed into hers. *Id.* at 910-11. She was denied compensation because (1) her "lunch breaks were completely unsupervised and she was free to go anywhere or do anything she wanted during them," and (2) her employer "did not require or encourage Grayson to purchase lunch elsewhere or use her car . . . [and] provided an eating area for its employees . . . with tables, benches and vending machines." *Id.* at 912. This court affirmed that ruling. *Id.* at 910. The CRB distinguished *Grayson* on the basis that a package delivery driver like Brogdon does not have a standard employer-provided lunch area and "cannot be expected to

eat inside the work truck each day." The nature of Brogdon's itinerant work "exposes him to greater risks," the CRB reasoned, and while the risks of accidents from lunch-related travel "may be considered personal in other more sedentary employment scenarios, the substantial evidence of record in this case supports that [Brogdon's] use of the scooter was akin to seeking rest." Essentially, the CRB concluded that *Grayson* was not controlling because Brogdon was a traveling employee without a fixed break area that had onsite lunch options.

One member of the CRB panel dissented, concluding that *Grayson* controlled the analysis. The dissent reasoned that the risk of lunchtime accidents "appears to me to be completely personal" and that the risks Grayson and Brogdon took would have been personal even "if neither Grayson nor [Brogdon] had elected to use a conveyance but had merely been injured while walking to lunch to a location off the worksite, in this case, away from the delivery truck." UPS and Liberty Mutual now petition this court for review.

## II.

We review CRB decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Gaines v. D.C. Dep't of Emp. Servs.*, 210 A.3d 767, 770 (D.C. 2019) (citation omitted); D.C.

Code § 2-510. We will affirm the agency's rulings so long as they are supported by substantial evidence, meaning "(1) the agency made findings of fact on each contested material factual issue, (2) substantial evidence supports each finding, and (3) the agency's conclusions of law flow rationally from its findings of fact." *Bentt v. D.C. Dep't of Emp. Servs.*, 979 A.2d 1226, 1231 (D.C. 2009) (quoting *Georgetown Univ. v. D.C. Dep't of Emp. Servs.*, 971 A.2d 909, 915 (D.C. 2009)). Although we defer to an agency's reasonable interpretation of the statutes it administers, "the ultimate responsibility for deciding questions of law is assigned to this court." *Id.* (citation omitted).

A worker who suffers an accidental injury "arising out of and in the course of employment" is generally entitled to workers' compensation benefits. D.C. Code § 32-1501(12); *see Wash. Post v. D.C. Dep't of Emp. Servs.*, 852 A.2d 909, 910-11 (D.C. 2004) (outlining the burden-shifting framework for such claims). The "arising out of" and "in the course of employment" components are "distinct concepts," and both must be established. *Lee v. D.C. Dep't of Emp. Servs.*, 275 A.3d 307, 312 (D.C. 2022) (quoting *Gaines*, 210 A.3d at 771). The "arising out of" test concerns the origin or cause of the injury, whereas "in the course of" refers to the "time, place and circumstances under which the injury occurred." *Kolson v. D.C. Dep't of Emp. Servs.*, 699 A.2d 357, 361 (D.C. 1997) (citation omitted). Both prongs are designed

to probe the same central question: whether the injury was sufficiently connected to work to be covered.

Before delving into those requirements, though, it is worth acknowledging that workers' compensation is *not* based on employee fault. Generally speaking, an employee's negligence is no obstacle to receiving benefits. "Fault has nothing to do with whether or not compensation is payable." *Grayson*, 516 A.2d at 912 (citation omitted); *see also* 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 1.03 (2022) (hereinafter "Larson's") (negligence and fault do not ordinarily affect the right to compensation benefits). Thus, the issue before us is not whether Brogdon was careless for choosing to ride a scooter, but whether his scooter ride arose out of and in the course of his employment for UPS. With that background in hand, we turn to the two prongs of the inquiry.

**A.**

We begin with the "in the course of employment" prong of our inquiry. "[A]n accident occurs 'in the course of employment' when it takes place within the period of the employment, at a place where the employee may reasonably be expected to be, and while he or she is fulfilling duties of his or her employment or doing something reasonably incidental thereto." *Kolson*, 699 A.2d at 361 (citation

omitted). The baseline rule is that injuries that happen on an employee's commute to or from work, or while on a break during the work day, are not within the course of their employment. Courts have recognized a number of exceptions to this "going or coming" default rule, however, including when the employee is paid for their commuting or break time.

Under this "well-established exception to the going and coming rule," when employees are paid for their travel or break time, "the trip is within the course of employment." *Lee*, 275 A.3d at 315 (citation omitted); *see also Grayson*, 516 A.2d at 911 & n.3 (recognizing "paid lunch exception to the 'coming or going' rule"). Here, where UPS does not contest that Brogdon's injury occurred during a paid break, the paid time exception suffices to bring Brogdon's activity within the course of his employment. UPS thus understandably focuses its challenges on the "arising out of" prong of the analysis, which we turn to next.

**B.**

Whether an injury arises out of one's employment "refer[s] to the origin or cause of the injury." *Bentt*, 979 A.2d at 1232 (alteration in original) (citation omitted). "[A]ll risks causing injury to a claimant can be brought within three categories: risks distinctly associated with the employment, risks personal to the

claimant, and 'neutral' risks—*i.e.,* risks having no particular employment or personal character." *Id.* (alteration in original) (citation omitted). Injuries arising out of employment-related risks are universally compensable. That encompasses those risks closely tethered to an employee's job duties; if a stack of packages toppled over on Brogdon when loading or unloading his truck, for instance, any resulting injury would clearly stem from an employment-related risk. *See Lee*, 275 A.3d at 313. Injuries stemming from personal risks—risks particular to the claimant independent of their work—are universally noncompensable. *Id.* They include risks like dying a natural death or being wounded by one's mortal enemy while on the job. *Id.*

Then there are so-called neutral risks, which are neither distinctly associated with the employment nor personal to the employee. *Id.* For instance, if Brogdon had been hit by a stray bullet or gored by a wild animal while on his route, those risks would be neither closely tethered to his employment nor personal to him. *See Georgetown Univ.*, 971 A.2d at 916 (citing what is now 1 Larson's §§ 3.05, 8.03). For neutral risks, we have adopted the "positional-risk" test to determine whether an injury arises out of one's employment. *Bentt*, 979 A.2d at 1230. Under that test, we consider whether the "conditions and obligations of employment placed claimant in the position where she was injured." *Id.* (citation omitted).

Here, the relevant risk was Brogdon crashing his electric scooter rental en route to lunch. That risk is not employment-related, because traveling for lunch was not closely tethered to the requirements of Brogdon's job. Whether the risk was purely personal to Brogdon is a closer call, but we conclude that it was not. Because Brogdon's transient work placed him in a position where one might expect him to travel for lunch, even if it was not strictly necessary, the injury was not "thoroughly disconnected from the workplace," *Muhammad v. D.C. Dep't of Emp. Servs.*, 34 A.3d 488, 496 (D.C. 2012), and it is not "clear that the employment contributed nothing to the episode," *Clark v. D.C. Dep't of Emp. Servs.*, 743 A.2d 722, 727 (D.C. 2000) (citation omitted), so that we cannot deem it a purely personal risk.

We therefore consider Brogdon's injury as arising from a neutral risk, and assess its compensability under the positional-risk test.[2] As noted, this test asks whether the employee's injuries "would not have happened but for the fact that conditions and obligations of the employment placed [them] in a position where [they were] injured." *Bentt*, 979 A.2d at 1230 (citation omitted). Employees need

---

[2] In *Grayson*, both the agency and this court similarly applied the positional-risk test, though our opinion does not illuminate the predicate question of whether Grayson's injuries stemmed from a neutral risk (this court's precedents had not yet articulated that concept). *See* 516 A.2d at 911-12; *see also Clark v. D.C. Dep't of Emp. Servs.*, 743 A.2d 722, 727 (D.C. 2000) (endorsing this conceptual framework for the first time, citing to Larson, *supra*).

not show that their work required them to be "in the particular place at the particular time" of the injury, as "many workplace injuries occur in circumstances in which the employer did not dictate the precise location of the employee at the precise time of the injury." *Gaines*, 210 A.3d at 773 (break-time injury covered when employee fell on WMATA escalator at the Metro station where she was assigned to work). But the positional-risk test still requires a showing that the conditions or obligations of employment generally placed the employee in the position in which the injury occurred. *See Niles v. D.C. Dep't of Emp. Servs.*, 217 A.3d 1098, 1102 (D.C. 2019) (employee "at least" had to establish that her employment placed her in the Metro station where she was injured on the day of the injury).

Here, we agree with the ALJ and dissenting CRB member when they each concluded that Brogdon's decisions to rent an electric scooter and travel a considerable distance for lunch rendered his injuries so attenuated from his work that they cannot be said to have arisen from his employment. Brogdon's employment did not put him in a position where he had little choice but to make his scooter trek. *See, e.g.*, *Lee*, 275 A.3d at 310 ("Lee's work [as a bus driver] effectively left her stranded several blocks away from her origin point (and vehicle), so that the hazards of her return to where her shift began are better seen as part of her employment."). Brogdon's trip more closely resembles a personal errand given that he had a

particular lunch spot that he had made prior plans to eat at, and traveling there took him afield from his route. Brogdon brought the risk upon himself; it did not just happen to befall him while in a position caused by his employment. The CRB's contrary view cannot be squared with *Grayson*.

Recall that in *Grayson*, a WMATA bus driver was taking her personal vehicle offsite for lunch. 516 A.2d at 910. She was hit by another vehicle while pulling out of her parking space, and her resulting injuries were deemed noncompensable because (1) her "lunch breaks were completely unsupervised and she was free to go anywhere or do anything she wanted during them," and (2) her employer "did not require or encourage Grayson to purchase lunch elsewhere or use her car," and instead "provided an eating area for its employees at the garage with tables, benches and vending machines." *Id.* at 912. In short, the agency reasoned that the conditions of Grayson's employment as a bus driver did not expose her to the dangers associated with driving her personal vehicle offsite for lunch. *Id.* at 912-13. This court affirmed. *Id.* at 913.

In attempting to distinguish *Grayson*, the CRB observed that Brogdon did not have "use of a standard lunch area" provided by his employer and "cannot be expected to eat inside the work truck each day." That might be a persuasive

distinction if Brogdon had simply parked his truck near, and walked up to, a lunch spot or park bench along his route. Proximate pit stops like that would seem closely tied to, and virtually required by, the transient nature of Brogdon's work.[3] But the distinction is not a meaningful one here, as the record does not suggest that Brogdon lacked other options more immediately upon his route where he might get lunch or find a table to sit at. To the contrary, Brogdon's testimony made clear that he could have stopped at a nearby convenience store like a "7-Eleven," but he did not want to do that because he "kind of hate[s] going to 7-Eleven" and had done it "too many times." While it is quite understandable that Brogdon did not want a convenience-store lunch, *Grayson* cannot be distinguished on that basis, where it was equally understandable that the claimant preferred to eat offsite rather than from the vending machines available onsite. The CRB's failure to meaningfully distinguish *Grayson* renders its decision capricious. *See New York Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1181 (D.C. Cir. 2004) ("An agency acts arbitrarily and

---

[3] For this reason, we do not agree with the CRB's dissenting member that if Brogdon had simply "walk[ed] to lunch" at any "location off the worksite," any injuries he suffered would be noncompensable. For an itinerant employee like Brogdon who has no physical worksite, immediately proximate pit stops where one might seek food, water, a bathroom break, or rest should essentially be seen as an extension of one's workspace (the equivalent of an employee break room or restroom). It was Brogdon's decision to travel to an out-of-the-way restaurant, prompting him to rent a scooter because of how far it was, that severed the connection to his employment and rendered his injuries noncompensable.

capriciously if . . . it has not persuasively distinguished" precedent) (citation omitted).

For essentially the same reasons, the CRB's appeal to the personal comfort doctrine does not support its conclusion. This court has never expressly endorsed the personal comfort doctrine, but (1) it has broad acceptance in other jurisdictions, *see* 2 Larson's § 21, (2) the CRB has applied it in multiple cases, and (3) no litigant before us disputes its application in the District. We therefore assume, without deciding, that it applies.[4] The doctrine renders injuries compensable when an employee, "within the time and space limits of their employment, engage[s] in acts

---

[4] The CRB invoked the personal comfort doctrine in assessing the "arising out of" prong of its analysis. In jurisdictions that have adopted the doctrine, there is a split of authority as to whether it pertains to that prong of the analysis at all, or if instead it operates only to bring an activity "within the course" of one's employment. *Compare In re Compensation of Watt*, 505 P.3d 1021, 1024-25 (Or. Ct. App. 2022) (discussing conflicting views and concluding that "arising out of" prong is not independently satisfied by personal comfort doctrine), *and Circuit City Stores, Inc. v. Ill. Workers' Comp. Comm'n*, 909 N.E.2d 983, 990 (Ill. App. Ct. 2009) ("[T]he personal comfort doctrine does not answer the whole question of compensability because it addresses only the 'in the course of' requirement; the 'arising out of' requirement must be met independently."), *with Cadmus Mags. v. Williams*, 515 S.E.2d 797, 798 (Va. Ct. App. 1999) ("[A]n injury sustained by an employee while engaged in the performance of an act essential to his personal comfort . . . is compensable as 'arising out of' and 'in the course of' the employment.") (quoting *Bradshaw v. Aronovitch*, 196 S.E. 684, 686 (Va. 1938)). We do not resolve that issue here, and instead assume the doctrine applies to the "arising out of" prong of the analysis.

which minister to personal comfort." *Id.* Short breaks for eating, drinking, using the restroom, or smoking are prototypical scenarios to which the doctrine applies. But the doctrine does not apply where one's "departure" from their work "is so great that an intent to abandon the job temporarily may be inferred." *Id.* Here, Brogdon's decisions to travel to a bagel shop that was a fairly substantial distance away from his truck, and to do so via electric scooter, fit that mold so as to bring his activity outside the personal comfort doctrine's contours. *See supra* note 3.

In summary, Brogdon's trek to a bagel shop was not so connected to his employment that one can reasonably say it arose out of his employment. He was traveling there because he had plans to meet a friend, and Brogdon "wanted to try [the bagel shop] out" since it had dietary options friendly to pescatarians, like himself. He chose to travel there via scooter precisely because his choice of restaurant was so far away from his truck that traveling there and back by foot would have taken too long. Those decisions reflect personal choices that are sufficiently attenuated from Brogdon's work as to bring his injuries outside the scope of his employment. Just as in *Grayson*, Brogdon's "lunch breaks were completely unsupervised," and employees were "free to go anywhere or do anything [they] wanted during them," 516 A.2d at 912, with the only caveat being that Brogdon had to stay within a mile of his route. And unlike Grayson, who had only a 20-minute

lunchbreak that obviously restricted her lunch options, Brogdon had a 70-minute break here, so that his decisions about how to spend that time were more obviously attenuated from (and less dictated by) the conditions of his employment than in *Grayson.* 2 Larson's § 13.05[4] (citing cases concluding that break-time injuries were compensable when employers allowed workers to leave the premises but only one particular store was reachable during the break time allotted).

Brogdon counters with *Kolson*, in which a Greyhound bus driver was attacked as he walked to a hotel that his employer had provided for the evening, and we held his injuries both arose out of and occurred within the course of his employment. 699 A.2d at 361. But the conditions of employment in *Kolson* were far more closely connected to the injury than they are here. Kolson's injuries "resulted from a risk created by his employment—his arrival at odd hours in places away from his home and the necessity of using the public streets to seek lodging." *Id.* In addition, Kolson was walking from a Greyhound terminal to the very hotel that Greyhound directed he check into in the pre-dawn hours. *Id.* at 358. *Kolson* would be more on point if, rather than making his way to nearby and employer-dictated lodging, the claimant was injured en route to a more distant hotel that he had chosen based on his personal interest in trying it out. Our reasons for concluding that Kolson's injury arose from

his employment simply would not apply to those facts, and they similarly do not apply to the facts before us now.

We have declined to find injuries compensable when they arose out of risks more closely connected to the conditions of employment than those we confront here. In *Bentt*, for example, a doctor received nerve-blocking injections to alleviate pain from a non-work-related injury on the recommendation of her supervisor, but the injections led to ulcerous skin that required surgery. 979 A.2d at 1229. The supervisor himself administered the injections, on hospital grounds, after the claimant's colleagues noticed her limping on the job. *Id.* Still, we held the injury did not "arise out of" employment because "the conditions of Bentt's employment did not expose Bentt to the dangers of a maladministered injection." *Id.* at 1233. In another case, we held that an attack of acute ventricular tachycardia, which an employee contended was "precipitated by the interaction of employment-induced stress with his pre-existing cardiac condition," did not arise out of employment. *McKinley v. D.C. Dep't of Emp. Servs.*, 696 A.2d 1377, 1378 (D.C. 1997). Or consider *Niles*, a case in which a WMATA employee was injured at a metro station on her way to work; we held that the obligations of her employment and WMATA's encouragement to its employees to ride the Metro did not satisfy the positional-risk test. 217 A.3d at 1102-03.

Under the positional-risk test, the conditions and obligations of Brogdon's employment did not put him in the situation where his injury occurred. The CRB's contrary conclusion is at odds with our precedents and cannot be sustained.

**III.**

The CRB's judgment is reversed, and we remand for further proceedings consistent with this opinion.

*So ordered.*